## In re AMES DEPARTMENT STORES, INC., et al., Debtors.

### No. 01–42217 (REG).

United States Bankruptcy Court,
S.D. New York.

Feb. 26, 2004.

---

Weil, Gotshal & Manges, LLP, by Martin J. Bienenstock, Esq., Michele J. Meises, Esq., Timothy Q. Karcher, Esq. (argued), New York City, for the Debtors and Debtors in Possession.

Otterbourg, Steindler, Houston & Rosen, P.C., by Scott L. Hazan, Esq., Rosanne Finkel, Esq. (argued), New York City, for the Official Committee of Unsecured Creditors.

Law Offices of Leo Fox, by Leo Fox, Esq. (argued), New York City, for DSM Realty Inc. and Valley Properties.

## DECISION ON MOTIONS FOR PAYMENT OF REAL ESTATE OCCUPANCY ADMINISTRATIVE EXPENSES (D.S.M. REALTY, INC. AND VALLEY PROPERTIES, INC.)

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in the jointly administered chapter 11 cases of Ames Department Stores and its subsidiaries ("Ames," or the "Debtors"), the Court has before it motions for payment, with administrative expense priority over the claims of other creditors, by landlords D.S.M. Realty, Inc. and Valley Properties, Inc. (the "Landlords"), whose leases ("Leases") for retail space previously used by Ames have now been rejected. The requests present five separate issues, several of which are recurring ones in chapter 11 cases in this district and elsewhere.

The first two involve (1) whether a debtor-tenant's lease can be rejected when, contrary to a cleanup obligation in its lease, it leaves behind, on the premises, abandoned personal property that assertedly results in a continued occupancy of the premises on the part of the tenant, and (2) whether unsatisfied cleanup obligations under rejected leases give rise to postpetition obligations, under sections 503(b) or 365(d)(3) of the Code, or instead give rise to pre-petition rejection claims.

The third arises from Ames' rejection of the leases in mid-month, after rent was due at the beginning of the month. The Landlords assert that because the Leases required monthly rent to be paid in advance on the first of the month, the rental payment for the full month must now be paid in full, even though the Debtors lost their right to occupancy upon their mid-month rejection. Ames and its non-landlord creditors counter that requiring payment in full would grant a windfall to the Landlords, and that monthly rent should instead be prorated through the rejection date.[1]

The fourth is unique to this case, in which Ames is faced with the risk of ad-

---

1. In this case, in anticipation of the upcoming rejection effective date, Ames did not pay the rent at all for the final month, giving rise to a request by the Landlords for the payment of such rent. The estate's liability, as an administrative expense, for that last month's rent through the date of rejection is undisputed.

ministrative insolvency, and in which Ames, the Landlords and a DIP financing lender, Kimco Funding, LLC ("Kimco"), entered into a stipulation to resolve objections by the Landlords to a then-pending motion (the "Objections Withdrawal Stipulation"), which may have changed the rights that parties otherwise might have when a debtor is administratively insolvent. The Landlords acknowledge the law in this Circuit, and in the bulk of the courts elsewhere, that expenses payable under Bankruptcy Code section 365(d)(3) have administrative priority but not an implied super-priority, and thus, when an estate is administratively insolvent, unpaid section 365(d)(3) claims share *pari passu* with other unpaid administrative expenses. But the Landlords contend that this general rule is trumped under the unique facts here, where the Objections Withdrawal Stipulation, so-ordered by the Court, provided that Kimco would fund post-petition rent until the lease in question was rejected.

Fifth, and finally, the Court must determine the extent to which one Landlord's section 365(d)(3) entitlement properly includes claims for its attorneys' fees.

Applying the law to the facts here, the Court determines:

(1) Ames' compliance with its cleanup obligations was not a condition precedent to its exercise of its statutory right to reject leases;

(2) At least under the facts here, Ames' failure to comply with its contractual duties to clean up the premises upon the termination of the lease, when such took place after rejection, gave rise to a *pre-petition* claim for breach of the lease, and not a post-petition breach—and did not, by itself, make Ames a holdover tenant liable for continued rent or other liability after the time of its rejection;

(3) As claim for 365(d)(3) payment here was made after rejection (and not when the debtor was continuing in occupancy), Ames's liability under section 365(d)(3) is limited to the pro-rata accrual for its occupancy obligations in the post-petition, *pre-rejection* period. Ames is not now liable for obligations relating to the time after the debtor-tenant's rejection—though if timely request had been made by the landlord for payment in full of section 365(d)(3) obligations while the debtor-tenant was still in occupancy, this Court would have required payment by the debtor in full, subject to disgorgement in the event of subsequent rejection and any resulting overpayment to the landlord;

(4) The Landlords are entitled to payment by Kimco, under the terms of the Objections Withdrawal Stipulation, of the post-petition rent that Kimco agreed to fund; and

(5) Valley is entitled to reasonable attorneys fees, as authorized under its lease, as part of Ames' section 365(d)(3) obligations.

*Facts*

The material facts were undisputed, and the Court thus had no need for an evidentiary hearing.

Until it became clear, in the course of its chapter 11 case, that Ames could not successfully reorganize as an ongoing business and would have to liquidate, Ames was a discount retailer, operating hundreds of stores in leased premises. Its store leases—a large number of which were executed years ago, in environments of lower rental rates—in many cases had substantial value, and an important aspect of the Ames chapter 11 case has been the array of real estate decisions to be made concerning the stores and store leases, particularly with respect to whether leases

could be sold by "assume-and-assign" transactions, or instead would be rejected.

In at least most cases, Ames explored marketing particular leases, and decided to reject leases only after coming to a view that marketing efforts would be unsuccessful or not cost-effective. To facilitate its marketing efforts, Ames secured DIP financing from Kimco, secured by its leases—or, perhaps more precisely, the proceeds of "assume-and-assign" sale transactions with respect to those leases. An objection by certain landlords (including D.S.M. and Valley) to the Kimco DIP financing motion was consensually resolved by the Objections Withdrawal Stipulation, so-ordered by the Court the next day. It provided, in relevant part:

1. The objection filed by the Landlords to the Motion for an order approving the Kimco DIP Loan is hereby withdrawn subject to the terms and conditions set forth below.

. . .

3. Each Landlord's rights, if any, under the lease and applicable law to seek to lift the automatic stay, to compel payment of post-petition rent[,] to compel compliance with an existing confidential agreement with the Debtors, or to seek an earlier time for the assumption or rejection of their lease, are all reserved (as are the rights of Kimco and the Debtors to oppose such motions).

. . .

6. In the event any of the Landlord's leases are rejected or excluded after the Kimco Credit Agreement becomes effective, Kimco shall fund the post-petition rent until the earlier of (i) the effective date of rejection or (ii) thirty (30) days after such lease is excluded under the Kimco Credit Agreement.[2]

In connection with the marketing efforts, the Court approved expedited rejection procedures for any leases the Debtors were unable to sell.[3] Pursuant to those procedures, Ames sought to reject the two leases at issue here. On March 20, 2003, the Debtors served a rejection notice on D.S.M., indicating that, unless an objection was received by the Debtors within ten days thereafter, the lease governing D.S.M.'s store would be rejected as of that day, and personal property located at the premises would be abandoned. On April 4, 2003, Ames served a rejection notice on Valley, likewise indicating that, unless an objection was received within ten days thereafter, the lease governing Valley's store would be rejected as of April 4, 2003 and personal property located at the premises would be abandoned.

Ames vacated the premises and returned the keys to the properties on March 20, 2003 and April 4, 2003, respectively. As of the time it did so, Ames had not paid the rent that came due on each lease on the first day of the month in which each store was vacated. Additionally, Ames abandoned personal property on the premises (principally shelving, racks, bins and similar trade fixtures) that had to be removed and/or cleaned up, at somebody's expense—even though each lease required that at the termination of the lease, the premises were to be left by the tenant clean and/or free of goods and effects.[4]

2. Stipulation and Order Settling Objections of Landlords ("Stipulation"), so ordered 10/23/02 (ECF # 1281), at 1–2.

3. They generally provided for lease rejections to be initiated upon notice, with rejections to become effective, in the absence of objection, on the later of the date of the notice, the date

of surrender of the leased premises, or any other date set forth in the notice.

4. Paragraph 6.05 of the D.S.M. Lease requires that the tenant leave the "[b]uilding reasonably clean and tenantable and repair[ ]

However, there was no showing here that the Debtors intentionally damaged the premises; committed any other kind of post-petition tort with respect to the premises; or placed hazardous materials on the premises that might endanger public health or safety. Rather, the issue here was solely one of the burden and expense of removing non-hazardous personal property that was appropriately on the premises during the time before rejection. As the Landlords put it:

> It is believed that the Debtor, during its liquidation sale, sold any asset in the Premises of value. As such, the only personal property left on the Premises would have little to no value and would cost substantially more to remove tha[n] it would yield at any sale.[5]

The Landlords filed timely objections to the two rejection notices. They contended principally (1) that the leases could not be rejected unless and until the premises were left in clean condition, as required under the Leases; (2) that unpaid administrative expense obligations, including payment *in full* of the rent that was due under each lease on the first of each month (and not just the pro-rata portion allocable to the period of pre-rejection occupancy), had to be satisfied as a condition to rejection; and (3) that if Ames lacked the funds to meet post-petition rental obligations, such obligations should be paid by Kimco.

For both practical reasons (to facilitate the Debtors' need to vacate the premises and cut off accruing administrative obligations, and to facilitate the Landlords' efforts to re-let the properties and thereby mitigate damages), and because the result as to this aspect of the controversy was so obvious,[6] the Court permitted the rejections to be effective on the respective dates specified in the two rejection notices. But this decision was without prejudice to the Landlords' requests for payment, as administrative expenses, of any sums they contended would be due—both for unpaid post-petition rent and for the cleanup expenses. Without objection from either side, the Court converted the motions into motions for payment of administrative expenses.

*Discussion*

*I.*

*Removal of Abandoned Property as A Condition to Rejection*

Ames' notice of rejection advised the Landlords of an intent to abandon movable merchandise display fixtures located at the premises—primarily shelving, racks, and bins that Ames believed to be of inconsequential value. The Landlords agreed that this abandoned property was

---

any damages caused by such removal." Similarly, the Valley lease requires the tenant:

> At the termination of this Lease, to remove such of the Tenant's goods and effects as are not permanently affixed to the Leased Premises; to repair any damage caused by such removal; and peaceably to yield up the Leased Premises and all alterations and additions thereto and all fixtures, furnishings, floor coverings and equipment which are permanently affixed to the Leased Premises (which shall thereupon become the property of the Landlord) clean and in good order, repair and condition, damage by fire or unavoidable casualty excepted.

> Any equipment or personal property not removed from the Leased Premises in accordance herewith shall be deemed abandoned by the Tenant and may be removed by Landlord at Tenant's expense and disposed of or retained by the Landlord in any manner the Landlord deems fit.
> Valley Lease § 7.1L.

5. Memorandum of Law in Support of Landlords' Administrative Expense Obj. ("Landlords' Mem.") (ECF # 2107) dated June 16, 2003, at 9 (apparent typographical error corrected).

6. See page 51, *infra*.

of little to no value to the estate, and that Ames had the authority under section 554 to abandon such property,[7] but contended, as the first of their several points, that Ames' failure to remove this property would prevent its rejection of the leases in question. The Landlords argued that pursuant to the Leases, Ames had to deliver the premises free from debris, and that until such debris was removed, the Debtors "cannot be deemed to have surrendered possession."[8] Thus, the Landlords argued, because the Debtors had not properly surrendered possession, the Leases could not be rejected.

The Debtors acknowledged that they failed to fulfill their obligations under the Leases to clean the properties prior to vacating. But they asserted that this failure did not prevent their rejection of the Leases, but instead gave rise to an additional pre-petition claim for breach of contract. They argued that the Landlords' theory—that any defaults under the Leases must be cured prior to rejection—ignored the very purpose for which debtors are granted the power to reject burdensome contracts.

Section 365(a) of the Bankruptcy Code provides, in relevant part:

> Except as provided in subsections §§ 765 and 766 of this title[9] and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's

approval, may assume or reject any executory contract or unexpired leases of the debtor.

None of the subsections (b), (c) or (d) referred to places any limitations or requirements on rejections, though section 365(d)(3) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, *until* such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.[10]

The Court necessarily must reject the Landlords' implicit contention that the Debtors' statutory right to reject can be qualified by requirements not in the Bankruptcy Code itself, and especially by an implied requirement of compliance with lease covenants that are burdensome to the debtor, and that may form part of the rationale for rejection in the first place. A rejection is a court-authorized breach of an executory contract.[11] When the exercise of business judgment makes such advisable, the estate can, by rejection, be relieved of the duty of continuing post-petition performance on a contract, and the landlord's claim for any damages arising from the rejection is a pre-petition claim for breach of contract.[12] The ability to

---

7. Pursuant to section 554 of the Bankruptcy Code, a debtor-in-possession "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."

8. Landlords' Mem. at 10.

9. Those sections relate to commodity broker liquidations, and are not relevant here.

10. Emphasis added.

11. *See Medical Malpractice Insurance Ass'n v. Hirsch (In re Lavigne),* 114 F.3d 379, 386 (2d

Cir.1997) ("If the contract has not been previously assumed, rejection of the debtor's executory contract constitutes a breach of the contract").

12. *See id.* at 387 ("The [rejection] claim is treated as a pre-petition claim, affording creditors their proper priority"); *accord* 4 Resnick & Sommer, *Collier on Bankruptcy* ¶ 502.08[2].

Bankruptcy Code section 365(g) provides, in relevant part:

> Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the

reject provides the trustee or debtor-in-possession with the means to relieve the estate of the duty to perform on burdensome obligations at the expense of all of the estate's other creditors, and to avoid the incurrence of additional administrative expenses which lack a corresponding benefit to the estate.[13]

Particularly in the case of commercial real estate leases—with respect to which, during the pre-rejection period, the estate must comply with post-petition obligations under section 365(d)(3) irrespective of the corresponding benefit to the estate—the ability to reject burdensome post-petition obligations is one of the most fundamental rights of a trustee or debtor-in-possession (and thus the creditor body generally) under the Bankruptcy Code. It would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition to doing so, to comply with one of the very aspects of the agreement that is bur-

densome. And Ames is correct when it argues that acceptance of the Landlords' position would amount to acceptance of the notion that a cure of defaults—which is required to *assume* a lease—is likewise a condition to *reject* a lease, and when it argues that any such holding would eviscerate the important benefits provided under the Code to reject burdensome lease obligations.

The Court likewise must reject the Landlords' argument that Ames' abandonment of its personal property amounted to a failure to surrender possession, and that such would preclude rejection.[14] Section 365 does not, by its terms, require the surrender of occupancy . before or as a condition to rejection—though it is plain that after rejection, the debtor has no right to continued occupancy of the premises it occupied under the now-rejected lease,[15] and it is at least strongly likely that if a debtor sought to continue occupancy after rejection (including by the

debtor constitutes a breach of such contract or lease—
(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition. . . .
Similarly, Bankruptcy Code section 502(g) provides:
A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

13. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1098 (2d Cir.1993) ("The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or

debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property,'") quoting 2 *Collier on Bankruptcy* 365.01[1] (15th ed.1993); *id.* ("In short, § 365 permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

14. As the Landlords put it, "[a]s long as Debtor is there and is occupying the premises[,] he is held and should be held to be doing everything that he should have been doing before the bankruptcy ... in terms of paying rent and complying with his obligations." (Arg. Tr. at 15).

15. *See, e.g., In re NETtel Corp., Inc.,* 289 B.R. 486, 489 (Bankr.D.D.C.2002) (Teel, J.) ("*NETtel*") ("Upon rejection of a commercial lease, the trustee abandons his right to enjoy occupancy under the lease.").

storage of goods in which it has a continuing interest), the landlord would be entitled to relief from the stay to complete eviction, compensation under section 503(b) for the use of the leased premises after the date of rejection, or both. But this Court need not and does not now decide that issue. Here, without dispute, Ames *abandoned* the property in question. It was not seeking to store property in which it had a continuing interest. If a debtor-tenant did so (and, as a result, it was in essence acting as a holdover tenant), the Court could consider the award of appropriate relief to the landlord under traditional section 503(b) doctrine.

The two cases cited by the Landlords in support of their argument, *In re Walmar Screen Printing Co.,*[16] and *In re Trak Auto Corporation,*[17] do not support a contrary view. *Walmar*, a case under Chapter X of the former Bankruptcy Act, did not involve a motion to reject, or any conditions (such as cure of defaults) to be satisfied in order to permit rejection. It rather involved a landlord's request for administrative expense treatment of clean-

up expenses,[18] a distinct issue discussed below. *Trak Auto*, a case decided under the Code, likewise did not involve a motion to reject, or any conditions to be satisfied in order to permit rejection, and principally involved landlords' requests for payment of administrative expenses,[19] requests that the debtor assume or reject their leases,[20] and requests for an order requiring the tenant to repair and clean up the premises *before* rejection.[21]

## II.

### *Cleanup Costs as a Pre-petition or Post-petition Expense*

The Landlords further argue that whether or not Ames properly rejected the leases without first removing its abandoned property, the cleanup costs for removing the abandoned property must be deemed to be an administrative expense.[22]

The Landlords' entitlement, if any, to administrative expense treatment for their cleanup costs would arise from one or both of sections 503(b)(1) and 365(d)(3) of the Code. The former provides:

---

16. 177 F.Supp. 684 (E.D.N.Y.1959) (Byers, J.) ("*Walmar*").

17. 277 B.R. 655 (Bankr.E.D.Va.2002) (Adams, J.) ("*Trak Auto*").

18. *See* 177 F.Supp. at 684–685.

19. *See* 277 B.R. at 658–661.

20. *See id.* at 660.

21. *See id.* at 659.

22. In this case, Ames had to terminate its retail operations and go into a liquidation mode, and administrative insolvency is a material risk—though it is possible that the estate's efforts to sell property and recover in avoidance actions could ultimately be sufficient to make some distribution to unsecured creditors. Since the time that this substantial risk of administrative insolvency has been recognized, the Court has considered only the

*allowability* of administrative expense claims, and *payment* on allowed administrative expense claims has been deferred, to permit administrative expense claims to be paid *pari passu*, if necessary.

Under these circumstances, the Landlords recognize that in the absence of the Objections Withdrawal Stipulation, they would not be entitled to immediate payment if their administrative expense requests were allowed. They acknowledge the decision in this Court, approved and adopted by the Second Circuit, that section 365(d)(3) does not give rise to a species of superpriority claim over other administrative expense claims that would permit them to be paid ahead of other unsatisfied administrative expense claims. *See In re Microvideo Learning Systems, Inc.*, 232 B.R. 602 (Bankr.S.D.N.Y.) (Gallet, J.), *aff'd*, 254 B.R. 90 (S.D.N.Y.1999), *aff'd on basis of bankruptcy court's decision*, 227 F.3d 474 (2d Cir. 2000).

After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

The latter provides:

The trustee [or debtor in possession [23]] shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

Like so many matters in chapter 11 cases in this Court, this controversy is not in economic reality a controversy between creditors (here the Landlords) and a debtor. Rather, it is a controversy between one group of creditors (the Landlords) and the Debtors' *other* creditors, with respect to the allocation of the Debtors' limited resources to satisfy losses that many creditors will suffer. The controversy raises the issue of the extent to which the Debtors' contractual breaches on the lease obligations here should be treated differently than the Debtors' countless other breaches of obligations—both payment and otherwise—to their creditor community as a whole.

In this connection, the Court notes that if the Landlords' position were to be accepted, they would obtain a priority over the Debtors' other unsecured creditors, by which the Landlords' claims would be satisfied in full or nearly so, while unsecured creditors would receive little or no distributions on their claims.[24] The Court starts with the basic principle, expressly noted by the Second Circuit, that grants of administrative expense priority cut against the general goal in bankruptcy law to distribute limited debtor assets equally among similarly situated creditors, and thus that statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed.[25] "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute."[26]

The Court thus considers the potentially applicable statutory provisions, and the caselaw construing them.

### A.

The first of those statutory provisions, section 503(b), provides for administrative expense treatment for "the actual, necessary costs and expenses of preserving the estate ... for services rendered after the commencement of the case." However, a debt is not entitled to administrative expense treatment merely because the right to payment arises after the debtor-in-possession has begun managing the

23. See Bankruptcy Code section 1107 (providing, generally, with exceptions not relevant here and except as otherwise ordered by the court, that "a debtor in possession ... shall ... perform all the functions and duties ... of a trustee serving in a case under this chapter [11]").

24. *See* n. 22, *supra.*

25. *See Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986) (*"McFarlin's "*) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed").

26. *Id.* (quoting *Nathanson v. NLRB,* 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952)).

debtor's affairs.[27] Instead, for an expense to be given administrative expense status, two elements must be satisfied. First, the expense must arise "out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession"; second, the creditors consideration for the expense must be "both supplied to and beneficial to the debtor in possession in the operation of the business."[28]

■ Several thoughtful decisions, all on closely similar facts, inform the Court's determination here that claims arising from contractual breaches of this character are not entitled to administrative expense treatment—at least under the facts in this case, where the cleanup obligation arises upon lease termination, and there has been no showing that hazardous materials were left on the premises or that damage to the premises was caused during the post-petition period.

The first of those cases, *In re Unidigital, Inc.*,[29] addressed very similar facts, in the context of a request for administrative expense treatment of cleanup and disposal expenses under section 503(b). In *Unidigital*, a large commercial printing press had been installed on premises the debtor leased from the landlord. Removal of the printing press was a major undertaking. It would require dismantling the machine and removing it through the windows by crane; employing a licensed plumber to disconnect the water and drain the chemicals; employing a licensed electrician to disconnect high power electrical cables from beneath the floor; and disposal of chemicals used in the printing process.[30] For those reasons, the debtor sought to abandon the printing press, under section 554(a) of the Code, to avoid the burden of its disposal. The landlord opposed the debtor's abandonment motion, and, as here, asserted that it was entitled to an administrative expense claim for its costs of removing the equipment and cleaning the premises.

The *Unidigital* court permitted abandonment, and, as relevant here, denied the request for administrative expense treatment. Noting, as this Court has above, that statutory provisions granting priorities are narrowly construed,[31] and that claimants seeking payment ahead of other unsecured claims bear the burden of establishing their entitlement to priority status,[32] it analyzed the request under the two-prong test discussed above.

It concluded that the requirements of neither prong were satisfied. The requirements of the first prong—requiring a transaction with the debtor in possession— were not satisfied, because the only transaction between the parties was the lease, which had been entered into pre-petition; under section 502(g) of the Code,[33] "all claims associated with the rejection of the

---

27. *See id.*

28. *Id. (citations omitted); see also, e.g., In re Enron Corp.,* 279 B.R. 79, 85 (Bankr.S.D.N.Y. 2002) (Gonzalez, J.).; *In re Patient Education Media, Inc.,* 221 B.R. 97, 101 (Bankr.S.D.N.Y. 1998) (Bernstein, C.J.) *("Patient Education Media"); In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 482, 488 (Bankr. S.D.N.Y.1991) (Conrad, J.) *("Drexel Burnham"); In re Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984) *("Jartran"); In re FBI Distribution Corp.,* 330 F.3d 36, 42 (1st Cir.2003) *("Filene's Basement"); In re Mammoth Mart,*

*Inc.,* 536 F.2d 950, 954 (1st Cir.1976) *("Mammoth Mart")* (Act Chapter XI case).

29. 262 B.R. 283 (Bankr.D.Del.2001) *("Unidigital")* (Walrath, J.).

30. *Id.* at 285.

31. *Id.* at 288.

32. *Id.*

33. *See* n. 12, *supra.*

lease are deemed prepetition claims."[34] The requirements of the second prong—benefit to the debtor's estate—were not satisfied either. Relying in part on the decision in *In re Allen Care Centers, Inc.*,[35] and in part on its own, plainly correct, analysis, the *Unidigital* court observed that:

> While it may seem inequitable to "saddle" [the landlord] SNY with the cost of cleaning up the Debtors' mess, absent a benefit to the estate, no priority claim is allowable. Like the services rendered in *Allen Care*, the cost of cleaning the landlord's premises does not benefit the estate here. Rather it only benefits SNY.[36]

Similarly, in the recent decision of *In re National Refractories & Minerals Corp.*,[37] the court was faced with a landlord request for administrative expense treatment when a debtor left leased premises—there a manufacturing facility—without having cleaned them up. However, the lease in question in that case had *two separate* obligations—one (not asserted to be present, or at least violated, here) requiring the debtor to maintain the premises in good condition during the term of the lease, and a second, very much like the obligations here, requiring the premises to be delivered up to the landlord "broom clean, in good order, condition and repair,"

upon the termination of occupancy.[38] The *National Refractories* court also faced allegations that hazardous wastes might have been left on the premises, and that post-petition damage might have been done to the premises. It was asked to decide what the landlord's entitlement would be under a spectrum of factual scenarios.

The *National Refractories* court ruled, with respect to the scenario in which hazardous materials had not been placed on the premises during the post-petition period, and there was no showing of post-petition damages to the premises,[39] that the landlord would *not* be entitled to the cleanup costs as an administrative expense. Considering the matter under each of sections 503(b) and 365(d)(3),[40] it noted that under section 503(b)(1), "[t]he terms 'actual' and 'necessary' are construed narrowly 'to keep fees and administrative costs at a minimum,' "[41] and rejected the landlord's contention that the debtor's obligation to return the Leased premises in good repair accrued post-petition when the debtor moved out.[42] Analyzing the Ninth Circuit's decision in *Dant & Russell*,[43] the *National Refractories* court noted *Dant & Russell's* requirement that any administrative expense claim under section 503(b)(1)(A) "must have a distinct post-

---

34. 262 B.R. at 288.

35. 163 B.R. 180 (Bankr.D.Or.1994) (costs state incurred to close down a nursing home facility abandoned by debtor were not a post-petition claim).

36. *Unidigital,* 262 B.R. at 289.

37. 297 B.R. 614 (Bankr.N.D.Cal.2003) (Tchaikovsky, J.).

38. *Id.* at 616 n. 1.

39. There has been no suggestion here that any of the property Ames abandoned was

hazardous waste, or that Ames did any damage to the premises, post-petition or otherwise; it merely failed to remove its abandoned property.

40. The latter analysis is discussed in connection with the Court's discussion of section 365(d)(3), in Section II(B) below.

41. *Id.* at 617, *quoting In re Dant & Russell, Inc.,* 853 F.2d 700, 705 (9th Cir.1988).

42. *Id.* at 618–620.

43. *See* n. 41, *supra.*

petition character," [44] and *Dant & Russell's* observation that "any damage that occurred post-petition became a pre-petition claim when the lease was rejected pursuant to 11 U.S.C. § 365(g)." [45]

The Landlords rely heavily on the decision in *Walmar*, which likewise involved a failure to surrender premises "broom clean," in a condition fit for occupancy, and a landlord's request for payment of the cleanup costs as an administrative expense.[46] But the *Walmar* decision does not require a result different from the decision suggested by *Unidigital* or *National Refractories*, even though *Walmar* stands for more than Ames contends it does. Although Ames is correct that the *Walmar* decision was limited, holding only that "[t]he claim is deemed to be proper for examination by the court," [47] that statement by the *Walmar* court, when viewed in full context, can only be read as a denial of the tenant estate's demurrer, and the rejection of the estate's contentions that cleanup costs could never result in a post-

petition claim. But *Walmar* has now been overruled, in effect, by statute. It was a case under the now-superseded Act, before the enactment of the Code, and, in particular, the Code's sections 503(b)(1) and 365(g)—the former of which now requires the two-pronged showing discussed above, and the latter of which treats rejection breaches of pre-petition leases as pre-petition claims.

■ Also, the *Walmar* conclusion rested heavily on the *Walmar* court's sense of "equity," and its conclusion that equity required the implementation of a fiction—that expenses incurred by the landlord, for its benefit, were "incurred not on its own behalf but for the account of the Debtor, for which it is to be reimbursed." [48] But as the Second Circuit has repeatedly reminded us after *Walmar*, bankruptcy courts are not free to substitute their own notions of equity for the provisions of the Code, even with the statutory authorization under Bankruptcy Code section 105(a).[49] Notions of equity do not author-

---

**44.** 297 B.R. at 618, *quoting Dant & Russell,* 853 F.2d at 706.

**45.** *Id., citing Dant & Russell,* 853 F.2d at 708.

**46.** *See* 177 F.Supp. at 685.

**47.** 177 F.Supp. at 686.

**48.** *See id.* at 685:

Obviously [the debtor] could not continue to occupy the premises and carry on its business in order to enable it to present a plan acceptable to creditors, and thus add to the accumulation of refuse, and then inform the Landlord at surrender, that the latter's claim for breach of the quoted clause in the lease could only be regarded as a breach of contract claim in the Chapter X proceeding. Such an attitude would offend the equitable nature of any bankruptcy proceeding. If the foregoing is true, it follows that the cost actually assumed in this case by the Landlord, was incurred not on its own behalf but for the account of the Debtor, for which it is to be reimbursed.

**49.** *See In re Momentum Manufacturing Corp.,* 25 F.3d 1132, 1136 & n. 4 (2d Cir.1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code"); *In re Joint Eastern & Southern Dist. Asbestos Litig.,* 982 F.2d 721, 751 (2d Cir.1992) ("[a] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations"). *See also In re Aquatic Development Group, Inc.,* 352 F.3d 671, 680 (2d Cir.2003) (Straub, J., concurring) ("[T]his Court has repeatedly cautioned that 105(a) "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity' " ") (quoting *In re Dairy Mart Con-*

ize this Court to convert a breach of a pre-petition rejected lease into a post-petition claim, when Congress has now said, in section 365(g) of the Code, that it is a pre-petition claim, nor do they authorize this Court to award an administrative expense when the requirements of section 503(b)(1) have not been satisfied.

### B.

■ Landlords' cleanup costs after rejection similarly do not warrant administrative expense treatment under section 365(d)(3).[50] As noted above, that section provides, in relevant part, with exceptions not relevant here:

> The trustee shall timely perform all the obligations of the debtor arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

While the Court assumes, without deciding, that section 365(d)(3) gives rise to a right to an administrative expense claim or payment of an administrative expense (even though it does not say so), and not just to an entitlement to an order requiring the debtor to comply with its post-petition lease obligations before rejection, the Court does not find there to be a section 365(d)(3) entitlement to the post-termination cleanup expenses here—especially since if the Landlords had tried to seek section 365(d)(3) performance before rejection, no enforceable obligation would have yet arisen.

Ames argues that its section 365(d)(3) obligations ended upon its rejection of the leases; that its cleanup obligation did not arise until the termination of the leases, after their rejection; that under other provisions of the Code—sections 365(g) and 502(g)—the Landlords' claims for damages for breaches of lease obligations upon rejection are *pre-petition* claims; and that to nevertheless subject Ames to administrative expense exposure for its failure to satisfy obligations under its now-rejected leases would eviscerate the benefits provided under the Code to be freed of burdensome post-petition lease obligations. Ames is right in all of these respects.

The relevant provisions of the leases provide the factual starting point for any analysis. The D.S.M. Lease, in its Section 6.05, requires that the tenant leave the "[b]uilding reasonably clean and tenantable and repair[ ] any damages caused by such removal." The Valley Lease, in its Section 7.1L, requires the tenant:

> At the termination of this Lease, to remove such of the Tenant's goods and effects as are not permanently affixed to the Leased Premises; to repair any damage caused by such removal; and peaceably to yield up the Leased Premises and all alterations and additions thereto and all fixtures, furnishings, floor coverings and equipment which are permanently affixed to the Leased Premises (which shall thereupon become the property of the Landlord) clean and in good order, repair and condition, damage by fire or unavoidable casualty excepted. Any equipment or personal property not removed from the Leased

---

*venience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir.2003)).

**50.** The Court expressly does not decide the extent to which damages suffered by a landlord by reason of a debtor-tenant's breach of another kind of covenant, requiring maintenance or an avoidance of damage to the

premises during a period of post-petition tenancy and before rejection, would be compensable under section 365(d)(3). Compare *National Refractories,* where the lease in question additionally had that type of covenant.

Premises in accordance herewith shall be deemed abandoned by the Tenant and may be removed by Landlord at Tenant's expense and disposed of or retained by the Landlord in any manner the Landlord deems fit.

Ames' arguments are correct for several reasons. First, impliedly under the D.S.M. Lease, and expressly under the Valley Lease, the removal/repair obligations that were breached here—which were contractual[51]—arose at the *termination* of the lease. The obligations were not continuing ones, such as the duty to pay monthly rent, that had to be satisfied on an ongoing basis before lease termination, as a condition to securing present and future benefits of tenancy. Without dispute, the termination of the Leases took place, under the facts of this case, upon or after rejection, and not before.[52] While covenants to pay post-petition *rent* were not satisfied during the pre-rejection period covered by section 365(d)(3) (for which Ames concedes section 365(d)(3) liability), there were no cleanup obligations to satisfy during that period of time. If, prior to rejection and lease termination, the Landlords had thought about seeking payment of the cleanup expenses as an unsatisfied obligation under section 365(d)(3), there then would have been nothing to ask for.[53]

Second, Section 365(d)(3), by its terms, provides that the obligations that must be satisfied under section 365(d)(3) are those *"until* such lease is assumed or rejected."[54] Whatever its ambiguity deficiencies may be in other respects, section 365(d)(3) is clear in providing that the claims in question, in the context of the lease provisions here, are not within that category. To the contrary, the landlord claims here were obligations arising upon or after the rejection.

■ Third, the Landlords' clean up claims also must be treated as pre-petition expenses by reason of sections 365(g) and 502(g) of the Code. The former provides, in relevant part:

> [T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—
>
> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter ... 11, ... of this title, immediately before the date of the filing of the petition;

The latter provides:

> A claim arising from the rejection, under section 365 of this title ... of an ... unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this

---

**51.** The Court here is not here faced with the issue of what the parties' rights and obligations might be in the event of post-petition *tortious* conduct, such as intentional damage to a landlord's property.

**52.** While rejection does not necessarily result in the termination of a lease, *see In re Yasin,* 179 B.R. 43, 49–50 (Bankr.S.D.N.Y.1995) (Bernstein, C.J.); *Lavigne,* 114 F.3d at 387 (quoting *Yasin* ), and state law determines the consequences of the breach resulting from rejection, both sides here recognize that the Leases here have now been terminated, and neither contends that termination took place *before* rejection.

**53.** This is quite a different issue, of course, from whether the Landlords would have a *claim* for cleanup expenses, in the event of a future failure to perform. Under section 101(5) of the Code, claims are much more broadly defined, and include rights to payment that are unmatured or contingent.

**54.** Bankruptcy Code section 365(d)(3) (emphasis added).

section, the same as if such claim had arisen before the date of the filing of the petition.

Thus sections 365(g) and 502(g) provide, unambiguously, that rejection claims are pre-petition claims.[55] And the claims in question here are plainly a species of rejection claims; like contractual claims for the rent that would be paid after rejection, these are contractual claims for the damages that the Landlords suffered after (and upon) the Debtor's rejection and removal from the premises.[56] The point is not that the Landlords had no legally cognizable injury when the Debtors failed to remove their shelving and racks—for plainly the Landlords did—but rather that Congress has made a legislative determination that rejection claims are pre-petition claims, with no priority over the claims of other unsecured creditors, who also suffered legally cognizable injury.

Fourth, if this Court were to hold that these cleanup costs are post-petition obligations, such a holding would be inconsistent with the doctrinal underpinnings under which motions to reject burdensome obligations are made, and would eviscerate the provisions of the Code that enable estates to relieve themselves of post-petition obligations under burdensome executory contracts.[57] Ames' promise to clean up the premises upon lease termination here, a promise made before the petition, was one such burdensome obligation; compliance would subject the estate to the expense, to be paid in post-petition dollars, of removing the shelving the Debtors had abandoned.

While the costs to the Debtors of removing the abandoned property would not necessarily be the same as the costs the Landlords would incur in doing so (for which the Landlords would be, and now are, seeking reimbursement), in each case the Debtors would be subjected, if the Landlords' contentions were to be adopted, to the burden of that pre-petition obligation, as an administrative expense. The exposure for such administrative expenses, on obligations that were first undertaken pre-petition, is exactly what the rejection provisions are supposed to avoid. For this Court to replace the burdensome post-petition obligation with another post-petition obligation would seriously undercut the entire purpose of the rejection process. There is nothing in section 365(d)(3)'s language, or (assuming legislative ambiguity in the statute in this respect) legislative history, suggesting such a Congressional purpose.

Fifth, and finally, the Court's conclusions in this respect are bolstered by the relevant caselaw. Once more the Court draws guidance from *National Refracto-*

---

55. *See Lavigne,* 114 F.3d at 387 ("Rejection gives rise to a remedy for breach of contract in the non-debtor party. The claim is treated as a pre-petition claim, affording creditors their proper priority").

56. *See National Refractories,* 297 B.R. at 617 (In context of request for administrative expense status for clean up costs under a rejected lease like those here, "[i]f the lease is rejected before it is assumed, the rejection constitutes a breach of the lease that is deemed to have occurred pre-petition. Thus, any damage claim for breach of a rejected lease is a general, unsecured claim").

57. *See Lavigne,* 114 F.3d at 386 ("The purpose behind allowing the assumption or rejection ... is to permit the trustee ... to use valuable property of the estate and to renounce title to and abandon burdensome property.... In short, ... the trustee [is allowed] to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject"), *quoting In re Orion Pictures Corp.,* 4 F.3d 1095, 1098 (2d Cir.1993) (citations and internal quotation omitted).

*ries.*[58] There the court considered the landlord's argument that "the Debtor's obligation to return the Leased Premises in good repair accrued post-petition when the Debtor moved out."[59] After analyzing the landlord's request for allowance of an administrative expense after a lease rejection under Code sections 503(b)(1) and 365(g),[60] and on a theory of holdover tenancy,[61] the court turned to analyze the request under section 365(d)(3). In the context of an additional lease provision requiring that the premises be kept in good repair during the course of the tenancy, it concluded that if the damage to the leased premises occurred post-petition, *pre-rejection,* and/or if the debtor first brought the abandoned items, including the hazardous materials, onto the leased premises post-petition, *pre-rejection,* the failure to repair the damage and to remove the items of personal property would violate section 365(d)(3).[62] But it went on to consider whether section 365(d)(3) would have been violated if the events giving rise to the repair costs occurred pre-petition—the scenario with which this Court is faced here. Following the reasoning of the Seventh Circuit in *In re Handy Andy Home Improvement Centers, Inc.,*[63] discussed more fully below, the *National Refractories* court focused on when the debtor-tenant's obligation to repair the premises "became fixed."[64] It then continued:

> If the Lease had been terminated just prior to the filing of the bankruptcy petition, the Debtor's liability for the Repair Costs would have been no different than those asserted in the Motion.

Thus, to treat them as administrative claims would be contrary to the "real-world situation to which the language [of 11 U.S.C. § 365(d)(3)] pertains."[65]

Here the Landlords did not have a second covenant in their leases, like the one present in *National Refractories,* prohibiting storage of the shelving and racks before termination of the Leases, nor did they make any showing that the abandoned property was not there pre-petition, and only appeared on the premises post-petition. More fundamentally, however, the analysis in *National Refractories* reinforces the analysis of this Court as discussed above. The obligation to clean up the premises—and to remove shelving and racks at the conclusion of the lease term—was in the leases pre-petition, and so far as the record reflects, most if not all of the abandoned property was on the premises pre-petition. If Ames had terminated the Leases just prior to the filing of the bankruptcy petition, Ames' liability for any cleanup costs would have been no different than the liability now asserted in the Landlords' requests for payment of administrative expenses, and, so far as the record reflects, the damages would not have been materially different in amount;[66] Ames would have had to clean up the premises and remove its racks and shelving, and if it failed to do so, the Landlords would have had a prepetition claim for their resulting expenses. Section 365(d)(3) does not cover such an obligation, and its breach is rather one of the many types of

---

58. *See* n. 37, *supra.*

59. 297 B.R. at 618.

60. *Id.*

61. *Id.* at 618–619.

62. *Id.* at 619.

63. 144 F.3d 1125, 1127 (7th Cir.1998).

64. 297 B.R. at 620.

65. *Id.* (brackets in original), *quoting Handy Andy,* 144 F.3d at 1128.

66. *See id.*

injury that are the components of a rejection pre-petition claim.

## C.

▮ The Landlords also argue, though not at length or in exactly these terms, that Ames is liable to them for "Holdover Rent"—an administrative expense under a species of holdover tenant theory.[67] Here, however, where the property was abandoned and not maintained on the premises for the Debtors' continuing benefit, the Court cannot agree.

The factual premise under which Holdover Rent would be appropriate, as apparent from *Trak Auto,* upon which the Landlords' rely, has not been satisfied here. In *Trak Auto,* the court was confronted with allegations that the debtor-tenant had rejected a lease but nevertheless continued to use the premises notwithstanding the rejection order. The *Trak Auto* court held, accordingly, that under such circumstances, the debtor-tenant would be liable, as an administrative expense, for its post-rejection use of the premises.[68] And *Trak Auto* strongly suggests (if it does not also squarely hold) that the intentional use of the premises for the storage of property in which the debtor tenant maintains a continuing interest would be deemed to be the requisite post-rejection use of the premises.[69] But the very language by which *Trak Auto* makes this suggestion also makes clear that it would be the maintenance of the personal property on the premises for the estate's *continuing benefit* that would trigger the duty to compensate the landlord, as compared and contrasted to leaving "remaining property" on the premises that is "abandoned." [70] Because the Debtors in this case have notified the Landlords that the remaining property is abandoned, they cannot be considered to be "maintaining occupancy" under that formulation.

In this respect too, the Court finds guidance from *National Refractories.* There the landlord also sought administrative expense status for holdover rent, but the court found no entitlement to it, concluding that "this claim must fail regardless of when the damage to the Leased Premises occurred." [71] Considering *Trak Auto* at

---

**67.** *See* Landlords' Mem. at 10 ("The Debtor must be ordered to continue paying rent to fulfill all of its obligations pursuant to [section 365(d)(3)], until such time as the lease is properly surrendered to the Landlord free and clear of the Debtor's property in a 'broom clean' condition", *citing Trak Auto* with a parenthetical that "if a debtor remains in possession by failing to vacate the premises once a lease is rejected, the estate becomes liable to the lessor for an administrative expense claim").

As the Landlords properly recognized, if this argument were to be accepted, it would not give rise to an administrative expense claim for the cleanup costs. It would rather be a claim for rent or "use and occupancy"—which might be more or less than the cost of removing the property. But to the extent it would be recoverable, after rejection, it would not be under section 365(d)(3), whose obligations, as discussed above, end on rejection. It would rather be based on a benefit to the estate, to be analyzed under section 503(b)(1).

**68.** *See* 277 B.R. at 664 ("By maintaining occupancy of the store after the rejection period, debtor becomes a holdover tenant. Debtor may end its holdover status by tendering possession back to its landlord or the landlord's agent").

**69.** *See id.* ("In cases where debtor has not physically been in the premises but where many of its possessions, such as shelving or signage, have remained in and on the location, debtor must take affirmative steps to notify the landlord that it surrenders the site and any remaining property is abandoned to the lessor, unless sooner removed by the debtor").

**70.** *Id.*

**71.** 297 B.R. at 618.

length and agreeing with its analysis, the *National Refractories* court held, as had the *Trak Auto* court, that a claim for post-rejection rent had to qualify as an administrative claim under section 503(b)(1).[72] As a lessor would be entitled to rent for the post-rejection period only "to the extent the use of the leased premises directly benefited the estate," [73] the landlord there was not entitled to Holdover Rent as an administrative expense:

> The Court concludes that [landlord] Centerpoint's claim for the Holdover Rent must fail because the Debtor did not actually occupy the Leased Premises during the 60 days in question. Therefore, there was no direct benefit provided to the estate during the fictional holdover period.[74]

As the *National Refractories* court properly recognized, the debtor was not "actually occupy[ing]" the premises by leaving behind abandoned personal property,[75] and derived no benefit from its storage. Though *National Refractories*, like *Trak Auto*, suggests a different result in a situation where the debtor elects, post-rejection, to store its property on the formerly leased premises and to derive a benefit from those premises after rejection, those facts are not present here, and that different factual situation can be addressed on another day.

For all of those reasons, the Landlords are not entitled to Holdover Rent here.

---

72. *Id.*

73. *Id.* (*citing Trak Auto*, 277 B.R. at 666–667).

74. *Id.* at 619.

75. *Id.*

76. It is to be distinguished from a similar, but nevertheless different, issue relating to whether section 365(d)(3) requires the payment of

## III.

### *Duty, Under Section 365(d)(3), To Pay Rent Allocable to Post–Rejection Period*

Ames rejected each of the D.S.M. lease and the Valley lease in mid-month, and vacated the premises on or before the date of rejection in each instance. Under the terms of both leases, full monthly rent was "payable in advance" on the first day of each calendar month, but in each case, in anticipation of the upcoming rejection, Ames failed to pay the final month's rent due at that time. The Landlords seek payment, under section 365(d)(3) of the Code, and as an administrative expense, for the *full* monthly rent that was due and payable for that final month with respect to each of the two leased premises—notwithstanding the mid-month rejection and Ames' loss of its right to use the leased premises after rejection. Ames concedes that it is liable, as an administrative expense, for the portion of the unpaid post-petition rent allocable to the period through the date of rejection. But it contends that it is not liable for post-petition rent, under section 365(d)(3) or otherwise, allocable to the period after rejection.

Thus this Court must decide whether a debtor tenant is liable, under section 365(d)(3), for rent originally due before the debtor's rejection of a lease but allocable to the period after rejection—an issue as to which the courts considering the matter have been sharply divided, and which this Court calls, for purposes of discussion, "Post-rejection Prorating." [76] While the

obligations that accrued in the pre-petition period but became payable after the filing of a bankruptcy case—or, by contrast, whether it requires a pro-rating of obligations billed in the post-petition period, to separate their pre- and *post-petition components*. The Court calls that similar but distinct issue, for purposes of discussion, "Pre-petition Prorating." Both Pre-petition Prorating and Post-rejection Prorating disputes raise issues of concern for

Second Circuit has not yet decided the matter, several other courts have, in this district and elsewhere. Four of the five relevant cases in this district (three in holding and one as part of its analysis) say that the debtor-tenant is liable for obligations under section 365(d)(3) relating only to the period through the date of rejection—or, putting it differently, that the section 365(d)(3) duty to pay post-petition lease obligations, when addressed after rejection, must be prorated to cover only the portion allocable to the pre-rejection period.[77] Authority in other jurisdictions holds similarly,[78] including authority

---

bankruptcy judges—whether courts should be awarding priority administrative expense status, at the expense of the creditor community generally, to claims for breaches of obligations that either because they accrued pre-petition, or are subject to Code sections 365(g) and 502(g), should instead be sharing, *pari passu*, with other unsecured claims.

**77.** *See In re McCrory Corp.*, 210 B.R. 934, 939 (S.D.N.Y.1997) (Chin, J.) (affirming, on bankruptcy appeal, bankruptcy court's decision to apply Post-rejection prorating, describing this as majority view); *In re Child World, Inc.*, 161 B.R. 571, 576 (S.D.N.Y.1993) (Goettel, J.), *rev'g* 150 B.R. 328, 333 (Bankr.S.D.N.Y.1993) (reversing decision of bankruptcy court, which had found, *inter alia*, that real estate taxes for a half year, to be paid under a lease, were not to be prorated, even though they covered a post-rejection period); *In re Swanton Corp.*, 58 B.R. 474, 475 (Bankr.S.D.N.Y. 1986) (Beatty, J.) ("Nothing in the rationale for the BAFJA amendment to Code § 365(d)(3) suggests that temporal proration is inappropriate. There is no reason why a debtor who rejects a lease after three months should be required to pay a full year's rental, particularly when the lessor has regained possession of its property"); *In re Ames Department Stores, Inc.* 150 B.R. 107, 109 (Bankr. S.D.N.Y.1993) (Goodman, J.) (an earlier chapter 11 case involving many of the same debtors as in these cases) ("*Ames I*") (Pre-petition Prorating case, but addressing Post-rejection Prorating as part of its analysis). As the *Ames I* court put it (there considering prorating of tax payment reimbursement obligations under a lease):

It is profoundly more sensible to conclude that, as of the filing, a landlord has an unmatured, pre-petition claim for reimbursement of the taxes which had accrued pre-petition. Thereafter, a landlord would have an administrative claim for those taxes which accrue post-petition but before rejection.
*Id.*

*Contra, In re R.H. Macy & Co.*, 1994 WL 482948, *12 (S.D.N.Y.1994) (Sotomayor, J., then a District Judge) ("*Macy's*") (in a Pre-petition Prorating case, impliedly rejecting Post-rejection prorating, based on view that section 365(d)(3) is unambiguous). Needless to say, this Court does not engage in a mechanical counting of the cases on each side of the controversy, but rather considers them in light of the analysis each brought to bear on the relevant issues.

One case in this district, involving Pre-petition Prorating, as contrasted to Pre-rejection Prorating, declined to approve prorating, in light of then-recent authority that had refused to adopt the prorating approach. *See Urban Retail Properties v. Loews Cineplex Entertainment Corp. (In re Loews)*, 2002 U.S. Dist. LEXIS 6186, 2002 WL 535479 (S.D.N.Y.2002) (Sweet, J.) ("*Loews*"). The Court feels that in the situation it faces here, it should follow the *Child World, McCrory, Swanton* and *Ames I* cases in this district, rather than *Loews*, for reasons discussed below.

**78.** *See NETtel*, 289 B.R. 486; *In re All for A Dollar, Inc.*, 174 B.R. 358, 361–362 (Bankr. D.Mass.1994) (Boroff, J.) ("this Court adopts the majority view which calculates a Debtors obligation under a lease during the postpetition, prerejection period on a prorated basis"; relying in substantial part on *Child World*, and criticizing *Macy's*); *In re Almac's, Inc.*, 167 B.R. 4, 8 (Bankr.D.R.I.1994) (Votolato, J.) ("joining with the 'substantial majority of the courts which hold that rent should be prorated to cover only the post-petition, pre-rejection period, regardless of the fortuity of the billing date,'" quoting *Child World*); *In re William Schneider, Inc.*, 175 B.R. 769, 772 (S.D.Fla.1994) (Aronovitz, J.) (agreeing with the "well reasoned analysis and conclusion" in *Child World*); *In re Warehouse Club, Inc.*, 184 B.R. 316, 318 (Bankr.N.D.Ill.1995) (Barliant, J.) (relying on *Child World*, while citing *Macy's* with a "*contra*"). *See also In re Victory Markets, Inc.*, 196 B.R. 6, 10 (Bankr.

that is particularly thoughtful and thorough.[79] But other cases hold to the contrary, including two cases at the Court of Appeals level.[80]

For the reasons set forth below—in part because a conclusion favoring Post-rejection Prorating comports with the majority of the authority on point in this district (and the Court regards uniformity in the district as desirable), but much more so by reason of the ambiguity of section 365(d)(3) and the persuasiveness of the caselaw on this side of the issue, particularly *NETtel*—the Court concludes that Post-rejection Prorating is required to avoid extending section 365(d)(3) beyond its intended effect, and to achieve fairness for other creditors. Thus claims for administrative expense priority under section 365(d)(3), after rejection, must be limited to the Pre-rejection period.

### A.

As usual, the Court starts with the words of the relevant statutory provisions. The Landlords' asserted entitlement to the satisfaction of lease obligations allocable to the period after rejection rests on section 365(d)(3). As noted above—but it is necessary and appropriate once more to quote it again here—section 365(d)(3) provides, in relevant part:

> The trustee shall timely perform all the obligations of the debtor arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or

rejected, notwithstanding section 503(b)(1) of this title.

But other sections of the Code also deal with obligations after rejection. Section 365(g) provides, in relevant part (with emphasis added):

> Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—
>
> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, *immediately before the date of the filing of the petition ....*

Similarly, Bankruptcy Code section 502(g) provides (again with emphasis added) that:

> A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, *the same as if such claim had arisen before the date of the filing of the petition.*

### B.

▉▉▉ "The starting point in discerning congressional intent ... is the existing statutory text...." [81] But "[a]s the Su-

---

N.D.N.Y.1996) (Gerling, C.J.) (in Pre-petition Prorating context, following *Child World* and its progeny, holding that the debtor should "fulfill its obligations set forth in the lease on a pro rata basis during the post-petition, *pre-rejection* period") (emphasis added).

**79.** See, in particular, *NETtel*, discussed at length below.

**80.** *See In re Koenig Sporting Goods, Inc.* 203 F.3d 986 (6th Cir.2000); *HA–LO Industries, Inc. v. CenterPoint Properties Trust*, 342 F.3d 794 (7th Cir.2003); *In re Comdisco, Inc.* 272 B.R. 671 (Bankr.N.D.Ill.2002); *Macy's*, 1994 WL 482948, at *12–13.

**81.** *Lamie v. United States Trustee*, —— U.S. ——, 124 S.Ct. 1023, 1025, 157 L.Ed.2d 1024 (2004) ("*Lamie*"); *Kelly v. Robinson*, 479

preme Court has often noted, '[s]tatutory construction [ ] is a holistic endeavor.' "[82] Statutory provisions (including, and perhaps especially, those in the Bankruptcy Code) must be construed *in pari materia*,[83] and one statutory provision in the Bankruptcy Code cannot be considered without reference to other relevant provisions of the same statute, and its object and policy.[84]

The Second Circuit has spoken clearly on this. As it observed in *Capital Communications Federal Credit Union v. Boodrow:*

It is clear that the "starting point in every case involving construction of a statute is the language itself. But the text is only the starting point," especially when the language is ambiguous. The Supreme Court has thus explained in interpreting other sections of the Bankruptcy Code that "we must not be guid-

ed by a single sentence or [part] of a sentence, but look to the provisions of the whole law, and to its object and policy."[85]

Thus section 365(d)(3) cannot be construed or applied without likewise considering *all* of the relevant statutory text[86]—including Bankruptcy Code sections 365(g) and 502(g).

 The threshold issue, in the statutory construction endeavor, is to determine whether in the respects applicable here, section 365(d)(3) is unambiguous— since the Supreme Court has repeatedly reminded us, as recently as in *Lamie*, this past month, that unambiguous statutes are to be applied in accordance with their terms, in situations where the result is not "absurd," even when inconsistent with what many would regard as the preferred result.[87] Courts are split on whether section 365(d)(3) is ambiguous,[88] but this

U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986).

**82.** *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir.) (*en banc* ) ("*Cybergenics* "), cert. dismissed, —— U.S. ——, 124 S.Ct. 530, 157 L.Ed.2d 406 (2003), quoting *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

**83.** *See Norton Bankruptcy Law & Practice 2d* § 154:5 (Nov.2003) ("Each provision in Title 11 [the Bankruptcy Code] must be read *in pari materia* with every other. . . . One cannot read any one section in isolation either from the statute as a whole or from any other provision").

**84.** *See Kelly*, 479 U.S. at 43, 107 S.Ct. 353 (in ascertaining the meaning of a statute, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (citations omitted); *Cybergenics*, 330 F.3d at 559 (same, quoting *Kelly* ); *In re Teligent, Inc.*, 268 B.R. 723, 733 (Bankr.S.D.N.Y. 2001) (Bernstein, C.J.) (same, quoting *Kelly* ). *See also CompuAdd Corp. v. Texas Instruments*

*Inc. (In re CompuAdd Corp.)*, 137 F.3d 880, 882 (same, quoting *Kelly*, and preceding its quotation with the observation that "[t]he Supreme Court cautions, however, against an overly literal interpretation of the Bankruptcy Code").

**85.** 126 F.3d 43, 49 (2d Cir.1997) (citations, including citation of *Kelly*, from which it quoted, omitted).

**86.** *See, e.g., Pennsylvania Dep't of Environmental Resources v. Tri–State Clinical Laboratories, Inc.*, 178 F.3d 685, 689 (3d Cir.1999) ("[t]o determine Congress' intent in enacting [Bankruptcy Code] § 503(b)(1)(A), we also must consider the other provisions of § 503").

**87.** *See Lamie*, 124 S.Ct. at 1030.

**88.** *Compare Child World*, 161 B.R. at 573–74 (section 365(d)(3) ambiguous); *McCrory*, 210 B.R. at 938–939 (same); *NETtel*, 289 B.R. at 489–492 (same), *with Macy's*, 1994 WL 482948 at *12 (section 365(d)(3) unambiguous); *In re F & M Distributors, Inc.*, 197 B.R. 829, 832 (Bankr.E.D.Mich.1995) (Shapero, J.) ("[t]he statutes wording is clear enough, at least to this Court, to avoid implications of

Court considers it plainly to be so—especially when section 365(d)(3) is considered, as it must be,[89] along with sections 365(g) and 502(g).

Courts regarding section 365(d)(3) as unambiguous have typically stated that they find either or both of the words "obligation" and "arise" to be unambiguous.[90] But this Court believes, with respect, that such analysis misses the mark, as (1) "arise" can be understood in either an absolutist or accrual sense, and (2) it is the *modifiers associated with* "obligations"— modifiers describing *which* obligations are the subject of the section 365(d)(3)'s coverage and to what the clause beginning "arising" refers, rather than the word "obligations" itself—that create the ambiguity. The clause "until such lease is assumed or rejected" is of critical importance to any analysis, in this Courts view, particularly

in light of sections 365(g) and 502(g) which treat failures to honor lease obligations after rejection as pre-petition claims.

Thus, section 365(d)(3) can be construed in two separate ways, with respect to each of "arises" and the modifiers—neither of which is unreasonable as a consequence of that provision's wording, structure and punctuation. (1) "Arises" can be construed to mean having arisen in (a) absolutist terms or (b) in an accrual sense.[91] And (2) "until such lease is assumed or rejected" can be construed to modify (a) "perform"—in which case it would support an absolutist view, inconsistent with prorating—or (b) equally or more plausibly, "obligations"—in which case prorating would be necessary and appropriate.[92] The reasonableness of view 1(b), with respect to "arises," impressed the *NETtel*

---

ambiguity which would then permit resort or reference to other sources or considerations to determine what the statute means"); *In re Duckwall–ALCO Stores, Inc.*, 150 B.R. 965, 976 n. 23 (D.Kan.1993) (Saffels, J.) ("The language of § 365(d)(3) is clear ...").

From time to time, section 365(d)(3) has been held to be unambiguous with respect to wholly different issues, or in contexts very different than that here. *See In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y.1986) (Feller, J.) (unambiguous with respect to duty to pay bargained-for rent in full, notwithstanding use of only a portion of the premises). Such cases have minimal relevance to the issues presented here.

**89.** *See* nn. 81–85, *supra.*

**90.** *See, e.g., Macy's*, 1994 WL 482948 at *12. While other decisions have done similarly, courts should be wary of relying on like expressions in those decisions wherein the respect in which the statute was unambiguous was not the same. *See, e.g., Coastal Dry Dock & Repair*, 62 B.R. at 882–83, where the court found section 365(d)(3) to be unambiguous in requiring post-petition, pre-rejection payments of rent at the full contractual rate, even though the debtor there had used only 10% of the premises—which, under traditional sec-

tion 503(b) analysis, would have made the debtor liable, as an administrative expense, for a lesser sum. "Obligations," as used in section 365(d)(3), may well be unambiguous in situations involving efforts to avoid current payment of contracted-for rent during the post-petition, pre-rejection, period, but it is not unambiguous when used for other purposes.

**91.** *See NETtel*, 289 B.R. at 490 ("The term 'arising' is susceptible of being used in an accrual sense"); *Handy Andy*, 144 F.3d at 1127 ("this 'billing date' approach is a *possible* reading of section 365(d)(3), but it is neither inevitable nor sensible") (emphasis added).

**92.** *See McCrory*, 210 B.R. at 939 ("Nor is it clear whether the phrase 'until such lease is assumed or rejected' limits the 'obligation' in question to those actually accruing before rejection"); *see also Child World*, 161 B.R. at 574 ("Black's Law Dictionary states that obligation is '[a] generic word ... having many, wide, and varied meanings, according to the context in which it is used.'" 6th ed.1993. We conclude that § 365(d)(3) is ambiguous as to when a debtor-tenant's obligation under a lease to reimburse the landlord for real estate taxes arises").

court and this Court. The reasonableness of view 2(b), with respect to what "until such lease is assumed or rejected" modifies, impressed the *McCrory* court, and this Court as well.

Those uncertainties, individually and especially collectively, plainly create an ambiguity, especially when one broadens the analysis, as one must, to consider sections 365(g) and 502(g), whose undisputed purpose and effect is to turn claims for an estate's failure to honor obligations after rejection into pre-petition, and not administrative, claims.

### C.

If one accepts, as this Court does, that section 365(d)(3) is ambiguous, then legislative history can then appropriately be considered.[93] When one does so, section 365(d)(3)'s proper construction is straightforward. As no one would seriously dispute, section 365(d)(3) was added to the Code to address two injustices to landlords. Under the law as it existed prior to 1984, post-petition lease obligations of a tenant estate were handled under section 503 of the Code, which sets out the general standard for the award of administrative expenses. Section 503(b) then, as now, made payable as administrative expenses the actual, necessary costs and expenses of preserving the estate, which would be given priority over general unsecured claims. Courts would typically allow as an administrative expense some amount for use and occupancy during the post-petition, prerejection period. But prior to 1984, when section 365(d)(3) was added, landlords could be required to wait for confirmation to recover their administrative claims for post-petition rent, even though landlords were required to continue to provide their property and services to the debtor's estate on an ongoing basis, starting with the earliest days of the bankruptcy case. And in addition, when their rights to recover on administrative claims were limited to those arising under section 503(b), landlords could be, and not infrequently were, denied the benefit of their lease bargains (even post-petition and before rejection), because the benefit to the estate arising from the estate's post-petition use of the leased premises was less than the bargained-for rent, or because prevailing rental rates had changed so that the fair market rental value of the premises had dropped below the originally bargained-for rent.

The addition of section 365(d)(3) to the Code, in 1984, addressed those concerns. Its purpose was explained by Senator Hatch:

> [D]uring the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.

---

**93.** *See, e.g., Child World,* 161 B.R. at 574 (concluding that section 365(d)(3) was ambiguous, and "[c]onsequently, we must examine the legislative history to discern Congress' intent"); *McCrory,* 210 B.R. at 939 (concluding that section 365(d)(3) was ambiguous, and "[a]ccordingly, I find it useful to turn to the legislative history of § 365(d)(3), as well as the overall operation of the Code, for guidance in construing § 365(d)(3)").

The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.[94]

As Ames and its unsecured creditors note, section 365(d)(3) was enacted to fix the amount to be paid by debtor-tenants pending assumption or rejection at the amount provided in the lease; to require payments to be made at the time required under the lease (and not after confirmation); and to remove the bankruptcy court's power to review the amount to be paid as administrative rent for reasonableness. And they also are correct in observing, as the *Child World* court did:

Nothing in the legislative history indicates that Congress intended 365(d)(3) to overturn the long-standing practice under 503(b)(1) of prorating debtor-tenants' rent to cover only the postpetition, prerejection period, regardless of billing date.... Allowing landlords to recover for items of rent which are billed during the postpetition, prerejection period, but which represent payment for services rendered by the landlord outside this time period, would grant landlords a windfall payment, to the detriment of

other creditors, without any support from the legislative history.[95]

Likewise, as the *McCrory* court noted:

Here, neither the language of the statute nor the legislative history reveals a Congressional intent to deviate from the pre-amendment practice of prorating lease obligations pending rejection, other than to require "current payment" for "current services." Rather, "Congress enacted 365(d)(3) to ensure that landlords would not be disadvantaged by providing post-petition services to the debtor." Put another way, Congress intended the subsection to put landlords on an equal footing, not to grant them a windfall at the expense of other creditors.[96]

And as the Seventh Circuit observed, in *Handy Andy:*

To give relief to landlords, Congress passed section 365(d)(3), which takes them out from under the "actual, necessary" provision of 503(b)(1) and allows them during that awkward postpetition prerejection period to collect the rent fixed in the lease. There is no indication that Congress meant to go any further than to provide a landlord exception to 503(b)(1), and thus no indication that it meant to give landlords favored treatment for any class of prepetition debts.[97]

The *Handy Andy* court continued:

Statutory language like other language should be read in context. The context consists not merely of other sentences

---

94. H.R. Conf. Rep. No. 98–882, at 598–99 (1984), reprinted in 1984 U.S.C.C.A.N. 576.

95. 161 B.R. at 575–76; *see also McCrory,* 210 B.R. at 938–939 (quoting *Child World,* and following its reasoning); *All for A Dollar,* 174 B.R. at 361 (same).

The windfall problem has been acknowledged by one of the courts taking the literalistic approach. *See Comdisco,* 272 B.R. at 675

("In short, § 365(d)(3) may often result in windfalls to the landlord, at the expense of other creditors and stakeholders (including other landlords) with equally worthy claims").

96. 210 B.R. at 939–940, *quoting In re Best Products Co.,* 206 B.R. 404, 406–407 (Bankr. E.D.Va.1997).

97. 144 F.3d at 1128.

but also of the real-world situation to which the language pertains. Here that situation concerned a class of postpetition debts. That is all that Congress was legislating in reference to. When context is disregarded, silliness results.[98]

Consideration of the legislative history plainly indicates to what the clause "notwithstanding section 503(b)(1) of this title" refers, and it plainly was *not* to do away with the hardly-offensive concept of prorating. There is no indication in the legislative history of section 365(d)(3) of any Congressional intention to subject debtors (or, more precisely, competing creditors) to section 365(d)(3) administrative expense burdens on obligations allocable to the period after rejection, or to negate the effect of sections 365(g) and 502(g) in that regard. As the remarks of Senator Hatch make clear, there was an unmistakable intention on the part of Congress, in enacting section 365(d)(3), to do away with prejudice to landlords, but there is no indication of a corresponding intention to grant landlords a windfall, especially at the expense of other creditors. And since a failure to apply Post-rejection Prorating could in other cases actually *prejudice* landlords—as it would, for instance, when taxes, common area maintenance, or, particularly, percentage rent obligations must be collected in arrears (after the amount to be billed becomes known), and the debtor

has already rejected—the absence of any Congressional intent to bring about such a result must also be noted.

### D.

The Court also must apply Post-rejection Prorating for a variety of other reasons, all of which cut in the same direction. First is the need to implement sections 365(g) and 502(g). Congress has directed the federal courts, with its enactment of sections 365(g) and 502(g), to treat claims for breaches of lease obligations following rejection as prepetition claims. Yet to require payment for obligations in the postrejection period would be to render those provisions nugatory. It would elevate the claims of landlords for the post-rejection period over the claims of all of the estate's other creditors—a result exactly contrary to the plain meaning, and purpose, of sections 365(g) and 502(g).

Second is the illogic of the Landlords' position. Senator Hatch noted, in explaining the rationale for the enactment of section 365(d)(3), as quoted above, "that the landlord is forced to provide *current services*—the use of its property, utilities, security and other services—without current payment." That Congressional concern is understandable with respect to the period before rejection, but it has no application

---

**98.** *Id.* (citations omitted). Additionally, even if section 365(d)(3) were regarded as less ambiguous than this Court believes it to be, that would not be the end of the story, at least in the Second Circuit. As the *McCrory* court noted:

> In recent cases interpreting the Bankruptcy Code, the Supreme Court has tempered its application of the plain meaning rule, particularly when it would effect a major change in practice under the Code as it existed at the time, unless there is support for such a change in the legislative history.

210 B.R. at 939. It continued, based on Second Circuit and Supreme Court holdings:

> When Congress amends the bankruptcy laws, it does not write on a clean slate.... Furthermore, [the Supreme Court] has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*Id.,* quoting *In re Klein Sleep Products, Inc.,* 78 F.3d 18, 27 (2d Cir.1996), in turn quoting *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

to the period after rejection. A landlord would not be providing "current services" after a debtor rejects a lease, for at that time the debtor would have no right to continued occupancy, or to services from the landlord.[99] And the landlord would be free to rent the premises to someone else. Indeed, requiring payment, as an administrative expense, for the post-rejection period while, at the same time, the landlord would be free to re-rent the premises, could result in a double recovery for the landlord.

Third is a concern, now that the Court finds section 365(d)(3) to be ambiguous, that declining to permit Post-rejection Prorating here, which would be unjust to the Debtors' other creditors in this case, could just as easily be unjust to a landlord in the next case to come down the pike. Some lease obligations, such as base rent and (sometimes) real estate taxes, can be anticipated and billed in advance, requiring the debtors to pay them for a period preceding the time of rejection. But the amount payable on other lease obligations—especially percentage rent, which typically is computed based on past sales—may be ascertainable only in retrospect, and may thus be billed by landlords in arrears. Depriving landlords of payment for such post-petition pre-rejection obligations, based on the happenstance that they could not be ascertained in advance and billed prior to rejection, would be unfair to landlords, just as billing debtors for post-rejection occupancy is unfair to the other creditors.[100] There is no reason to believe that in enacting section 365(d)(3), Congress ever intended such a result.[101]

Fourth is the reality that the literalistic approach proves too much, and leads to a near-absurdity when obligations billable to the tenant are allocable to periods going far in advance. Real estate taxes, for example, are not infrequently billed prospectively for six months in advance (as they

**99.** In the rare situation where, after rejection, a debtor tenant became a holdover tenant and continued to utilize the premises, the landlord would have a presumptive right to the payment of an administrative expense under section 503(b), and this Court, or others, might find it appropriate to require current payment of rent, in the contracted-for amount, as the just way to apply section 503(b), with an award of relief that would be similar or identical to the relief that would result from application of section 365(d)(3). But the Court does not need to address that now; it is not the situation here, or in the great bulk of cases in which rejection of leases is sought and obtained.

**100.** *See Ames I,* 150 B.R. at 109 ("Landlord's contention would lead to an inequitable and incongruous result. For example, if a Chapter 11 debtor rejects a lease one day before its annual reimbursement obligation for the past years' real estate taxes becomes payable, then that landlord would have neither a pre-petition nor post-petition claim to assert against the estate, if the payment due date is determinative").

**101.** With respect to another matter involving reciprocal fairness to landlords, the Debtors argue that, based on their view that pro-rating was required, they paid "stub rent" to the Landlords (along with all of their other landlords) for the period after their chapter 11 filings and prior to the next billing date. They argue that if Post-rejection Prorating were rejected, the rationale for rejecting it would also undercut Pre-rejection Prorating, and they would be entitled, under section 549, to a refund of all of the post-petition stub rent they paid prior to the time that any post-petition performance was required under their leases under section 365(d)(3). Because the Court believes that both types of prorating—Pre-petition Prorating and Post-rejection Prorating—are required, it has no occasion to consider this argument. The Debtors' point does suggest, however, that under the facts here (or in any case in which a landlord wants stub rent for the period following a bankruptcy filing and prior to the next billing cycle, and then seeks also to recover for rent allocable to the post-rejection period), a landlord is trying to have it both ways.

were in *Child World* ),[102] or even as much as a year in advance—as they were in *Swanton*[103] and *McCrory*.[104] Cases wrestling with this have come out in different ways, with those adopting the literalistic approach saying or implying that the courts can address inequitable situations when they arise, or that different rules might apply with respect to rental obligations, on the one hand, or tax obligations, on the other.[105] But such efforts to disregard the problems resulting from the literalistic approach are inconsistent with a principled analysis of the law. The Court sees no principled distinction between rental obligations and tax payment obligations, insofar as section 365(d)(3) requires such to be satisfied, or any indication that section 365(d)(3) creates different rules for obligations payable in advance or in arrears, or depending upon the *extent* to which they are due in advance or in arrears. Monthly rent obligations and tax obligations are both "obligations" under leases within any normal reading of that word, and, as noted, there is no difference in the means by which section 365(d)(3) addresses obligations of any particular type. This Court's rejection of the literalistic approach, like the Tenth Circuit BAP's rejection of it in a Pre-conversion

Prorating context in *Furr's* (plainly correctly, in this Court's view), avoids any and all problems of this type. Rather than articulating a principle of such illogical breadth that courts need to be apologizing for it in advance, or need to immediately limit holdings to their particular facts, this Court believes it more appropriate to consider whether such a potentially illogical and unjust rule was really what Congress intended when it enacted section 365(d)(3).

Fifth, but no less importantly, the Court is persuaded by the recent, and exceptionally thorough, analysis in *NETtel*, in which that court, faced with the same issue here, concluded that "rent 'arises' for purposes of 365(d)(3) in an accrual sense, meaning during the corresponding period of occupancy"—thus requiring prorating, and excluding, from a post-rejection request for administrative expense treatment, "rent that was due pre-rejection with respect to a right of occupancy in [the] postrejection period." [106]

The *NETtel* court, after lengthy analysis, rejected arguments by a landlord that section 365(d)(3) required payment of base rent for the entirety of a month, even though the trustee had no right of occupancy after rejection of the lease on the

**102.** *See* 150 B.R. at 330, Findings of Fact # 7,8,9 (landlord's tax bill covered taxes assessed for the second half of the fiscal year).

**103.** *See* 58 B.R. at 475 (leases provided for the payment of rent in the form of a single annual installment).

**104.** *See* 210 B.R. at 935 ("City of New Orleans prospectively issued tax bills for the real estate taxes owing with respect to the [p]remises for the entire year of 1996").

**105.** As the Tenth Circuit Bankruptcy Appellate Panel, speaking through Judge Nugent, observed, in *In re Furr's Supermarkets, Inc.*, 283 B.R. 60, 68 n. 13 (10th Cir. BAP 2002) ("*Furr's*"), rejecting a literalistic approach in that case in part for this reason:

We note that the Sixth Circuit's leading case involved a monthly, rather than a quarterly rent obligation payable in arrears as in the instant case, and we question whether a quarterly obligation would be treated similarly. *In re Koenig Sporting Goods, Inc.*, 203 F.3d at 989 n. 4–5. *Cf. Vause v. Capital Poly Bag, Inc.*, 886 F.2d 794 (6th Cir.1989) (rejecting argument that annual farm rent payable in arrears accrued only on the payment date). We also note that the only reported bankruptcy court case in the Tenth Circuit, *In re CCI Wireless, LLC*, 279 B.R. 590 (Bankr.D.Colo. 2002), distinguishes between monthly and longer-term interval rents.

**106.** *See* 289 B.R. at 487–88.

20th of that month. It started its analysis by recognizing that "[th]e critical economic burden contractually imposed on a landlord prior to rejection is the number of days that a trustee had the right of occupancy, and, correspondingly, that the landlord provided the space and services incident thereto (such as payment of taxes and utilities)."[107] It then recognized that "[u]nless section 365(d)(3) has a plain meaning that precludes any other interpretation, it is undesirable to interpret section 365(d)(3) as operating in a manner ... that depends on the fortuity of the time of the month of the order for relief," or, as relevant here, the time of the month of the rejection of the lease.[108] It noted that under the performance date approach, "a trustee would be obligated to pay for a full years rent that came due immediately after the order for relief even if the lease were rejected prior to the commencement of the year of occupancy covered by the payment," and that "Congress did not likely intend such absurd results."[109]

The *NETtel* court concluded, as this Court has above,[110] that section 365(d)(3) is ambiguous.[111] Thus, it viewed it appropriate "to turn to the legislative history of section 365(d)(3), the structure and purpose of the Bankruptcy Code as a whole, and pre–1984 law."[112]

The *NETtel* discussion of the legislative history of section 365(d)(3),[113] and of the pre–1984 law,[114] which was extensive in each respect, did not differ materially from this Courts discussion of such above, and will not be repeated at length here. But its discussion of section 365(d)(3) in the context of the structure and purpose of the Bankruptcy Code as a whole—particularly sections 365(g) and 502(g)—was particularly notable, and warrants discussion, and in several instances, quotation, here:

> The most important context for evaluating whether an obligation "arises" under the lease prior to rejection is that of the purposes of assumption and rejection. Assumption entitles the estate to the benefits of a lease, but also saddles the estate with all obligations under the lease as an administrative claim. Rejection is the opposite of assumption. Upon rejection, in contrast to assumption, the estate is not burdened with the

107. *Id.* at 489.

108. *Id.* at 489–490.

109. *Id.* at 490.

110. *See* page 67 above. However, it also made an additional point, not mentioned above one consistent with both economics (as recognized by the Seventh Circuit in *Handy Andy*) and the way bankruptcy judges normally look at obligations:

> Section 365(d)(3) addresses only those obligations "arising" after the order for relief and prior to rejection. The term "arising" is susceptible of being used in an accrual sense: a rental obligation arises **under the lease** based on the corresponding period of occupancy **under the lease.** A landlords entitlement to compensation for occupancy at a fixed periodic rate relates to the actual days the tenant was entitled to occupancy,

> and in a practical and fundamental economic sense can be said to arise on each occupancy day. The compensation for occupancy on a particular date may be payable in advance of that date (or may be payable subsequent to that date), but in the economic and historical senses that Congress had in mind, the compensation obligation arises on the date of occupancy. Here, the Base Rent, the obligation at issue, "could realistically be said to have arisen piecemeal every day."

> *Id.* at 490 (boldface in original, quoting *Handy Andy,* 144 F.3d at 1127).

111. *See* 289 B.R. at 492 & n. 12.

112. *Id.* at 492.

113. *See id.*

114. *See id.*

obligations under the lease as an administrative claim. *Instead, under 11 U.S.C. 365(g) and 502(g), rejection constitutes a breach, and the breach is deemed to have arisen prepetition.*[115]

Further examining the significance of rejection on debtor obligations that otherwise would have to be satisfied as administrative expense claims, the *NETtel* court explained—in analysis that is fundamental to the bankruptcy bench and bar, but which may not be as obvious to those who do not see this every day—that:

> [L]ooking to the postrejection period, the Bankruptcy Code works this way: rejection ends the trustee's further entitlement to enjoy the right of occupancy under the lease in the period after rejection, and in exchange the estate is relieved of the liability for such future right of occupancy as an administrative claim. As long as the estate has ceased occupancy of the property by the date of rejection, the estate is saddled with liability for the postrejection period only as a prepetition claim (entitling the landlord in a chapter 7 case to share pro rata, under 11 U.S.C. § 726(a), with holders of other general unsecured claims in whatever is left after payment of administrative and other priority claims).[116]

It reasoned, accordingly, that "there ought not be any administrative claim attributable to the estates nonexistent right of occupancy during the postrejection period, otherwise the estate [would] be saddled with a burden that rejection is designed to avoid."[117] To the contrary, "[s]ection 365(d)(3) ought to be viewed as dealing with the obligations arising under the lease for the estate's right to use the property in the period *after the petition and prior to rejection,* and as fixing that compensation at the rate provided by the lease:"[118]

> The performance date approach in applying § 365(d)(3) often converts what would be prepetition debt (attributable to either pre-order-for-relief occupancy or post-rejection occupancy) into an administrative claim, thereby violating the principle of creditor equality and distorting the priority and distribution provisions of other sections of the Bankruptcy Code. Without clearly indicating an intent to do so, Congress did not likely intend to upset these settled principles and priorities when it enacted § 365(d)(3). *Section 365(d)(3) does not warrant converting what would otherwise be prepetition debt into postpetition debt entitled to treatment as an administrative claim entitled to priority over prepetition unsecured debt.*[119]

As part of its analysis, the *NETtel* court further examined the earlier case law in this area, in what is by far the most thorough analysis of the subject. Understandably, the *NETtel* court gave substantial attention to *Handy Andy.* In *Handy Andy,* the Seventh Circuit, in a decision authored by Judge Posner, considered the different, but similar, issue of Pre-petition Proration, and concluded that such was

---

115. *Id.* at 491 (citations omitted; emphasis added), citing, *inter alia, Lavigne* a Second Circuit case, binding on this Court—114 F.3d at 384–385.

116. *Id.* at 491–492.

117. *Id.* at 492.

118. *Id.* (emphasis added).

119. *Id.* at 492–493 (citations, including *McCrory,* omitted) (emphasis added). The *NETtel* court noted, in this connection, *Pennsylvania Dept. of Pub. Welfare v. Davenport,* 495 U.S. 552, 563, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (court "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure").

necessary—rejecting landlord contentions that section 365(d)(3) required payment of real estate taxes that had accrued during the pre-petition period but which were only payable thereafter. The *NETtel* court came to the view, with which this Court now concurs,[120] that Pre-petition Prorating analysis informs decisions with respect to Post-rejection Prorating.

The *Handy Andy* panel had recognized, as noted above,[121] that the tax obligation before it "could realistically be said to have arisen piecemeal every day." [122] That observation, as the *NETtel* court properly recognized, would be no less true with respect to a base rent obligation. The *NETtel* court quoted the dissenter in a 2–1 decision of a panel of the Third Circuit that had decided to reject *Handy Andy*, in a Pre-petition Prorating case, where the

two judges in the majority had instead taken a literalistic approach:

> While the terms of the lease determine the obligation, the statute says nothing about how to determine when the obligation arises. Nothing in the text is inconsistent with the common-sense view that when an obligation arises may be fixed by the intrinsic nature and/or by the *extrinsic circumstances* of its accrual.[123]

The *NETtel* court then, entirely appropriately, carried those same principles over to a situation involving Post-rejection Prorating. It found, in that connection, that "the obligation to compensate the landlord with respect to the right of occupancy during the postrejection period similarly accrues, and hence arises, during that

**120.** After oral argument on this motion and the decision by another Seventh Circuit panel in *HA–LO*, this Court requested additional briefing with respect to the significance of *HA–LO*, and asked counsel to consider, among other things, whether the principles applicable to Pre-petition Prorating and Post-rejection Prorating necessarily should be the same. After that briefing, and further consideration of *NETtel*, the Court is persuaded that they should be; with respect to each of the pre-petition and post-rejection periods, Congress has determined that breaches of obligations *outside* such periods must be treated as pre-petition claims.

**121.** *See* n. 110, *supra.*

**122.** 144 F.3d at 1127.

**123.** 289 B.R. at 490 (quoting *Centerpoint Props. v. Montgomery Ward Holding Corp.*, 268 F.3d 205, 213 (3d Cir.2001) (Mansmann, J., dissenting)). As is apparent from this Court's discussion above and below, this Court believes that the better view was expressed by the unanimous panel in *Handy Andy* and by Judge Mansmann in *Montgomery Ward,* and that the discussion of the two judges in the *Montgomery Ward* majority—resting, as it did, on a premise that section 365(d)(3) is unambiguous and allows no consideration of the illogic of literalistically following it—lacked the depth of analysis of the four Circuit Judges on the other side of the issue.

Also, the decision here is not governed, in this Court's view, by *Loews,* see n. 77, *supra,* a recent decision of the District Court in this district, in a Pre-petition Prorating case preceding *NETtel,* which relied fairly heavily on the decision of the *Montgomery Ward* majority. *See id.* at *6. *Loews* is distinguishable in at least two significant respects. First, the lease there had not been assumed or rejected, *see id.* at *1, and thus *Loews* did not involve consideration of the effect of sections 365(g) and 502(g). Second, *Loews* expressly distinguished continuously accruing periodic obligations of the type presented here. *See id.* at *7 ("None of the cases cited above adopting proration dealt with a one-time capital expense reimbursement of the type described in the instant Lease. Rather, virtually all involved obligations that, by agreement, accrued over time ...."; distinguishing *McCrory* and *Child World* on the basis that their obligations (like the rent obligations here) "accrued on a daily basis," and "[t]hus, to the extent that a reading of *Section 365(d)(3)* within the context of a given lease might warrant proration, it would not apply in this case").

postrejection period." [124] It continued: "[a]lthough that compensation may be payable by the terms of the lease prerejection, the obligation *is fundamentally one that arises postrejection.* Otherwise, the landlord would be compensated for a period during which the landlord was not required to provide services." [125]

As the *NETtel* court noted, *Handy Andy* refused to follow the performance date approach under section 365(d)(3). And the *NETtel* court noted, as this Court has above, the *Handy Andy* court's observation that "the statute must be addressed in context, and '[w]hen context is disregarded, silliness results,' including the potential for converting prepetition debt into a postpetition administrative claim by virtue of the timing of payment of such debt under the lease." [126] As the *NETtel* court properly observed:

> Accordingly, in *Handy Andy*, 365(d)(3) did not entitle the landlord to utilize the performance date approach to convert a claim for compensation for usage prepetition into an administrative claim. *Similarly here, 365(d)(3) ought not convert the claim for breach of the debtor's obligation to pay for the right to use the premises during the period after rejection (which 365(g) and 502(g) treat as a prepetition debt) from a prepetition debt to an administrative claim.* [127]

### E.

Of course, any decision on this question necessarily must take into account the contrary decisions, at the Court of Appeals level, in *Koenig* and *HA–LO*, at the District Court level in *Macy's*, and by a Bankruptcy Court in *Comdisco*. While those decisions, in this Court's view, are not distinguishable in any meaningful way on their facts, this Court believes, with respect, that their analysis is not as persuasive, or thorough, as the contrary authority described above.

*Koenig*, a 2000 decision of the Sixth Circuit, involved the same facts as here. The debtor rejected its lease on the second of the month (and vacated the premises on the same day), and the landlord nevertheless sought base rent for the entirety of the month.[128] In approving the landlord's request, the *Koenig* court started with discussion, at some length, of the familiar principles (with which this Court does not disagree) requiring courts to apply unambiguous statutes in accordance with their plain meaning,[129] and providing that "[w]hen a statute is unambiguous, resort to legislative history and policy considerations is improper." [130] Then, with no more discussion of section 365(d)(3)'s language than quotation of it,[131] the *Koenig* court held that section 365(d)(3) is unambiguous.[132]

---

124. 289 B.R. at 491.

125. *Id.* (emphasis added).

126. *Id.* at 492, quoting *Handy Andy*, 144 F.3d at 1128.

127. *Id.* at 493 (emphasis added).

128. *See* 203 F.3d at 988.

129. *Id.*

130. *Id.*

131. *Id.* at 989. After quoting section 365(d)(3), the *Koenig* court noted the split in authority on the issue, *id.*, and went on to discuss the legislative history, *id.*, before coming back to its conclusion that section 365(d)(3) is unambiguous. Why it discussed the legislative history, given its conclusion that section 365(d)(3) is unambiguous, is unclear.

132. *Id.* ("Under these circumstances, § 365(d)(3) is unambiguous as to the debtor's rent obligation and requires payment of the full month's rent").

But with respect, the *Koenig* analysis was lacking in any substantive discussion as to *why* that court regarded section 365(d)(3) as unambiguous. In particular, it failed to discuss what it believed "until such lease is assumed or rejected" refers to. And it never mentioned sections 365(g) and 502(g) of the Code, or how section 365(d)(3) can be construed consistent with the requirements of those provisions.

*HA–LO,* a 2003 decision of the Seventh Circuit (by a panel with no overlap with the Seventh Circuit panel that had decided *Handy Andy* ), likewise involved the same facts as here. The debtor rejected the lease on the second of the month (vacating two days later), and the landlord nevertheless sought base rent for the entire month.[133] In approving the landlord's request, the *HA–LO* court, like *Koenig,* started with the familiar principle that when the words of a statute are unambiguous, judicial inquiry is complete.[134] But the *HA–LO* court at most implied (never saying expressly) that it regarded section 365(d)(3) to be unambiguous, and it most assuredly did not say *why* it regarded section 365(d)(3) as unambiguous.[135] The *HA–LO* court's analysis of section 365(d)(3), which started and ended with quotation of section 365(d)(3), conspicuously omitted discussion of that statute's sentence structure, and, as importantly or more so, omitted substantive discussion, or even mention, of the other relevant provisions of the Code, sections 365(g) and 502(g).

*HA–LO* did, of course, address the earlier decision of the Seventh Circuit in *Handy Andy,* rejecting the argument that *Handy Andy* was controlling. But *HA–LO's* effort to reconcile its holding with *Handy Andy,* with which *HA–LO* is inconsistent, was flawed. The *HA–LO* court took one basis for the *Handy Andy* holding—a recognition that pre-petition accruals must be regarded as "sunk costs," even when billed post-petition[136]—and satisfactorily was able to show the lesser application of that rationale in a Post-rejection Prorating setting. But the *HA–LO* court failed to address the more fundamental aspect of *Handy Andy* that would dictate the same result in *HA–LO*—that the position urged by the landlords in each of *Handy Andy* and *HA–LO* would transmogrify pre-petition debt into debt with administrative priority, contrary to the rigid standards Congress has imposed for such priority.

*HA–LO* surprisingly failed to address, or even to cite, *NETtel,* and that is unfortunate. If the *HA–LO* court had considered *NETtel,* it might have noted, as the *NETtel* court did, the significance of sections 365(g) and 502(g), and that section 365(d)(3) must be considered *in pari materia* with those sections of the Code. The *HA–LO* court might then have agreed that section 365(d)(3) cannot be construed without taking into account the Congressional determination, as embodied in those two provisions, that breaches of post-rejection obligations give rise to *pre-petition* claims—a matter giving rise, at the least, to a serious ambiguity in section 365(d)(3). Those provisions—part of the Code prior to the 1984 amendments and also thereafter—provided a critical part of the context for consideration of section 365(d)(3)'s meaning and effect. *Handy Andy* had warned of the dangers of construing section 365(d)(3) without regard to its con-

---

133. *See* 342 F.3d at 796.

134. *Id.* at 797–798.

135. *See id.* at 798–800.

136. *See id.* at 798–799, citing *Handy Andy,* 144 F.3d at 1127.

text;[137] consideration of *NETtel* would have facilitated an understanding of the "silliness" which the *Handy Andy* court understandably wished to avoid—"the potential for converting prepetition debt into a postpetition administrative claim by virtue of the timing of payment of such debt under the lease."[138]

Additionally, and once more with respect, had the *HA–LO* court considered *NETtel,* and more fully considered what *Handy Andy* did, and why, it would have seen that *Handy Andy* not only did not support the *HA–LO* decision, but rather dictated an opposite result. As the *NETtel* court observed:

> [I]n *Handy Andy,* § 365(d)(3) did not entitle the landlord to utilize the performance date approach to convert a claim for compensation for usage prepetition into an administrative claim. Similarly here, § 365(d)(3) ought not convert the claim for breach of the debtors obligation to pay for the right to use the premises during the period after rejection (which § 365(g) and § 502(g) treat as a prepetition debt) from a prepetition debt to an administrative claim.[139]

Also, the *HA–LO* court seemingly found it significant that *Handy Andy* involved tax reimbursement obligations, as contrasted to rent obligations,[140] but it failed to note that section 365(d)(3) makes no distinctions with respect to those two types of lease obligations (or any other)—a matter of no small significance to those who believe that statutes, when unambiguous (as section 365(d)(3) is in that respect), should be read in accordance with their terms.

This Court does not reject decisions at the Court of Appeals level lightly, even when those decisions are not binding upon it. But this Court nevertheless believes, with respect, that the analyses in *Koenig* and *HA–LO* are flawed, and lack the depth of analysis of *Handy Andy* and, particularly, *NETtel.*

For very similar reasons, this Court believes, with respect, that its decision here should not be controlled by *Macy's,* and that this Court should instead follow the contrary law in this district, in *Child World, McCrory, Swanton,* and *Ames I,* discussed above. In *Macy's* (an electronically posted transcript of an oral argument and dictated bench decision), a District Court, on a bankruptcy appeal, was faced with a request by a landlord for reimbursement of a tax bill paid by the landlord (and billed to the debtor tenant) after a post-petition, pre-rejection, reassessment with respect to the pre-petition period.[141] The *Macy's* court found "obligation" in

---

137. *See* 144 F.3d at 1128 ("[w]hen context is disregarded, silliness results").

138. *NETtel,* 289 B.R. at 492.

139. *Id.* at 493.

140. *See* 342 F.3d at 798 ("*Handy Andy* addressed a situation in which non-rent expenses (real estate taxes), for which Handy Andy was liable under the terms of the lease, had in part accrued prepetition.... We held in *Handy Andy* that the portion of taxes that accrued during Handy Andy's prepetition occupancy therefore had arisen pre-petition ...").

141. *See* 1994 WL 482948 at *11 ("the local county reassessed taxes on lease property and issued supplemental and adjusted tax statements to [the landlord] ... approximately six months after the filing of the Chapter 11 petition.... [T]his reassessment was for taxes owed for tax years 1987 through 1992 and all related to the prepetition tax period"). Thus this was a Pre-petition Prorating case, raising issues very similar to those later addressed in *Handy Andy,* which came to the opposite result.

section 365(d)(3) to be unambiguous,[142] disagreeing with the *Child World* court's conclusion to the contrary, and thus declined to direct prorating, even though it found the "policy aspects of his [the *Child World* court's] argument very persuasive."[143]

However, the *Macy's* court had no occasion to address, and did not address, the effect of sections 365(g) and 502(g), which are of considerable significance here but had little or no relevance there.[144] Similarly, it did not discuss the ambiguity with respect to the modifiers in section 365(d)(3) describing *which* "obligations" are the subject of that section's coverage; nor to what the clause beginning "arising" refers; nor how "obligations" is limited by the clause "until such lease is assumed or rejected." Finally, its decision preceded later thinking on the subject—most notably *Handy Andy* (which likewise addressed Pre-petition Prorating, in the real estate taxes context), *Furr's*, and *NETtel*.

Similarly, the Court is constrained to reject the conclusion of the Bankruptcy Court in *Comdisco*—another case on point on its facts—which, in a Post-rejection Prorating context, held that a monthly base rent payment that came due prerejection should not be prorated between the pre-rejection and post-rejection portions of the month. *Comdisco* declined to follow *Handy Andy*, and was relied on, in part, in *HA–LO*. But this Court, like the *NETtel*

court,[145] finds *Comdisco* unpersuasive, for the reasons stated in *NETtel* and also by reason of others. *Comdisco's* analysis, like the others on its side of the caselaw divide, did not discuss the effect of sections 365(g) and 502(g). And while *Comdisco* concluded that the debtor-tenants "sensible policy arguments" were "overridden by the plain language of section 365(d)(3),"[146] the *Comdisco* court did not parse the language of section 365(d)(3), or the other applicable Code provisions, in coming to the view that section 365(d)(3) is unambiguous. Its conclusion that construing section 365(d)(3) with prorating would "be the same as reading 503(b)(1) into it,"[147] and inconsistent with the "notwithstanding" clause in section 365(d)(3), is likewise unpersuasive, given the wholly different purpose for which the "notwithstanding" language was added, as discussed in Section III(C) above.

Also, this Court believes that *Comdisco's* efforts to distinguish *Handy Andy* were insufficient. *Comdisco* found it meaningful that *Handy Andy* dealt with an obligation payable in arrears, rather than an obligation payable in advance,[148] but that was a distinction without a difference; there is no basis in section 365(d)(3)'s text for distinguishing obligations on that basis.[149] And while the *Comdisco* court seemingly understood that *Handy Andy* en-

---

**142.** *Id.* at *12.

**143.** *Id.* at *13.

**144.** The *Macy's* discussion of the facts, see *id.* at *11, does not indicate that the lease had been rejected as of the time of the landlord's section 365(d)(3) motion, and in any event the effect of rejection is not discussed.

**145.** *See* 289 B.R. at 495–496.

**146.** 272 B.R. at 676.

**147.** *Id.* at 675.

**148.** *See* 272 B.R. at 674 (*"Handy Andy* did not deal with rent payable in advance"). Presumably the *Comdisco* decision was not driven by the fact that *Handy Andy* dealt with taxes and that case (like this one) involved rent; it read *Handy Andy*, properly, as requiring prorating for taxes and "presumably other charges." *Id.*

**149.** The Court thinks 365(d)(3) is unambiguous in that respect, but, ironically, if that is not so, then section 365(d)(3) is ambiguous for still another reason as well.

dorsed an accrual approach, with respect to amounts that "could realistically be said to have arisen piecemeal" every day of the relevant time period,[150] that approach would be no less applicable, in *Comdisco* or here, with respect to a landlords rental claim, which likewise would arise piecemeal over any given period of time.

### F.

For the foregoing reasons, the Court is unwilling, in the face of the ambiguity of the statute and its need to sensibly implement bankruptcy policy, to adopt an interpretation of section 365(d)(3) that is so at odds with its true legislative purpose and common sense. The Court rules that Post-rejection Prorating is necessary, in any instance in which a request for section 365(d)(3) payments is made after a lease has been rejected, and that the Landlords are entitled to unpaid rent under section 365(d)(3) to the extent—but only the extent—it is allocable to the post-petition, prerejection, period.[151]

### IV.

### Landlord Rights Under Objections Withdrawal Stipulation

 As noted above, the Landlords and the Debtors entered into the Objections Withdrawal Stipulation, so ordered by the Court, to resolve the Landlords'

objection to the Debtors' motion for approval of the DIP financing provided by Kimco. It provided, in its ¶ 6:

> *In the event any of the Landlord's leases are rejected* or excluded after the Kimco Credit Agreement becomes effective, *Kimco shall fund the post-petition rent until the earlier of (i) the effective date of rejection* or (ii) thirty (30) days after such lease is excluded under the Kimco Credit Agreement.[152]

Kimco, along with the Debtors, was a party to the Objections Withdrawal Stipulation.

The Landlords urge the Court to hold that ¶ 6 requires Kimco to fund the Debtors' post-petition rent obligations by paying such obligations directly to the Landlords. The Debtors argue that it merely requires Kimco to fund the Debtors for post-petition rent if the Debtors determine that such payments are to be made—contending that it does not require Kimco to fund the Landlords directly, and contending, at least impliedly, that factors that could cause the Debtors not to pay the Landlords, such as the Debtors' possible administrative insolvency, could trump the commitment of Kimco to fund the post-petition rent.

The Landlords plainly are correct in this regard. The condition that the Debtors

---

150. *See* 272 B.R. at 674, quoting *Handy Andy*, 144 F.3d at 1127.

151. The Court does not understand Ames to be arguing, and in any event it is not holding, that the requirements of section 365(d)(3) which would require payment of a full month's post-petition rent each month could be disregarded if a debtor contemplates filing a rejection motion (or even has filed it) but the lease has not yet been rejected, and the landlord has made its section 365(d)(3) motion before rejection. Under such circumstances, the landlord is entitled to payment in full of the debtor's section 365(d)(3) obli-

gations, in accordance with the plain language of the statute, subject to an entitlement to a partial refund to the debtor-tenant's estate, if it later appears, after rejection, that the estate has made an overpayment—in essence, that the landlord has been unjustly enriched. The court is not, by this decision, granting a license to tenant debtors to avoid paying post-petition rent when a rejection motion has not yet been granted, and a prompt and timely 365(d)(3) motion has been made.

152. Stipulation, ECF # 1281 at 2 (emphasis added).

would read into Kimco's obligations is conspicuously absent from the Objections Withdrawal Stipulation. And the language which *is* there does not support the Debtors' reading.

Moreover, construing the Objections Withdrawal Stipulation in the manner the Debtors urge would undercut the very purpose of the provision in question: to give the Landlords (who could have pressed for a much earlier time by which the Debtors would have to assume or reject their leases) comfort that they would not be prejudiced by the passage of time—as they might otherwise be if events materialized as they did here, with an estate in or near administrative insolvency. The Objections Withdrawal Stipulation gave the Landlords the comfort that they would be paid for the post-petition, pre-rejection, amounts to which they otherwise were entitled, as this Court well understood when it "so ordered" that stipulation. It unambiguously set forth the obligation on Kimco's part to fund the post-petition rent until the effective date of rejection, and was conspicuously devoid of the condition that the Debtors seek now to engraft upon the Objections Withdrawal Stipulation's terms.

Any contract deserves to be honored, but the Objections Withdrawal Stipulation entered into here is even more deserving of enforcement than most. The settlement of controversies—which often addresses parties' needs and concerns far better than could a court, which necessarily must decide issues within the four corners of the issues before it—is important to the public interest. The public interest in settlements—apart from the private needs and concerns of litigants—requires each settling party to be bound to the obligations it undertakes. Parties withdrawing objections in reliance on agreements incident to settlement must have confidence that those agreements will be enforced. A failure to do so, when a settlement is without question intended to be a binding agreement, and is appropriately documented or confirmed, could have a seriously chilling effect on future settlements, in this and other cases down the road.

The Objections Withdrawal Stipulation will be enforced in accordance with its terms.[153]

## V.

### Landlord Entitlement to Attorney Fees

■ The Valley Lease requires that the Debtor "pay on demand the Landlord's expenses, including reasonable attorneys' fees incurred in enforcing any obligation of the tenant under this Lease or in curing any default by the Tenant under this Lease as provided in Section 10.4."[154] (There apparently is not a like provision in the D.S.M. Lease). The payment of attorney fees *is* an obligation of the lease that must be satisfied under section 365(d)(3) when the lease at issue provides for such recovery as an obligation of the Debtor.[155]

---

**153.** The Court so rules notwithstanding the fact, which the Court fully appreciates, that if Kimco advances the funds, as the Court is now ordering it to do, Kimco will have a claim back against the estate, secured by a lien and/or superpriority, under its DIP loan agreement and related financing order—substituting a priority claim, for repayment, for a rent administrative expense claim that would otherwise share *pari passu* with other administrative expense claims. *See Microvideo*, 232

B.R. 602. That result, giving the Landlords an obligor with more financial muscle than the Debtors, was exactly what the Landlords bargained for, and is merely the reasonably foreseeable result of the stipulation into which the Debtors entered.

**154.** Valley Lease § 7.1K.

**155.** *See In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 756–757 (Bankr.S.D.N.Y.1986) (Brozman, J.) (Because lease provided for re-

The *amount* of fees to which Valley is entitled is more difficult to determine. The starting point, of course, is the parties' contractual agreement, quoted in relevant part above. But the parties have not addressed in their arguments how much should be awarded when counsel's fees were incurred on behalf of both Landlords, and only one was entitled to payment of them (but much of the same work would have been done if Valley were the only client), or under a scenario—which we now have—where Valley prevailed on part, but less than all, of its claims.

Counsel for Ames and the Landlords are to try, in the first instance, to reach agreement upon the appropriate amount,[156] failing which either side may bring any remaining controversy to the Court. When the amount is fixed, it likewise is to be paid by Kimco in accordance with the Court's rulings in Section IV above.

### Conclusion

For the foregoing reasons, the Landlords are awarded, as an allowed administrative expense claim, their post-petition rent, to the extent not previously paid, allocable to the period up to the date of rejection of each of the Leases, and their attorneys fees to the extent recoverable under the Valley Lease. The Debtor and Landlords are authorized and directed to confer and agree, if possible, on the liquidated amount for the sums thus awarded; in the event of an inability to agree, either party may bring remaining differences back to this Court for determination. Kimco is directed to pay that liquidated amount, as a further loan advance on its DIP loan facility, without prejudice to its rights to secure repayment of such in accordance with the applicable DIP loan agreement and financing order, and with any superpriority or lien rights with respect to repayment to which Kimco would otherwise be entitled.

The Landlords' requests for allowance of their administrative expense requests are otherwise denied. The Debtors are to settle an order in accordance with the foregoing, on no less than five business days' notice by hand or fax within ten business days of the date of this decision. As usual, the time to appeal with respect to the determinations made here shall run from the time of entry of that order, and not from the date of this decision.

---

covery of attorneys' fees and interest in an action to enforce the lease, their receipt deserved the same priority under section 365(d)(3) as any of the Debtor's other obligations that arise post-petition); *Loews*, 2002 WL 535479 at *9–*10 (same, citing *Westview 74th St. Drug Corp.*).

**156.** That agreement should take into account the Court's rulings that the cleanup costs and post-rejection rent were not obligations of the Leases compensable under section 365(d)(3), and that Valley's entitlement was a portion, but less than all, of the Landlords' total claim.